[S. F. No. 16988.   In Bank.   June 18, 1946.]

MARKET STREET RAILWAY COMPANY (a Corporation), Petitioner, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents. CITY AND COUNTY OF SAN FRANCISCO, Movant.

John J. O'Toole, City Attorney and Dion R. Holm, Public Utilities Counsel for Movant.

Cyril Appel, Ivores R. Dains and Pillsbury, Madison & Sutro for Petitioner.

Robert W. Kenny, Attorney General, Clarence A. Linn, Deputy Attorney General, Everett C. McKeage, Roderick B. Cassidy, Wyman C. Knapp, Frank B. Austin and John M. Gregory for Respondents.

SHENK, J.—The city and county of San Francisco has moved in this proceeding for a modification of the stay order issued on March 8, 1944. The Market Street Railway Company opposes the motion and seeks a modification of the order in its own behalf. The State of California resists both applications, and seeks to have the order stand without modification.

On November 30, 1943, the Railroad Commission ordered a reduction from seven to six cents in passenger fares charged by Market Street Railway Company in the operation of its street railway lines in the city and county of San Francisco. The company petitioned for a review of the commission's decision and order. This court issued a stay order pending final determination of the proceeding. The questions presented on that review have been determined adversely to the company's contentions, and the commission's order reducing the fare has become final. (*Market St. Railway Co.* v. *Railroad Commission,* 24 Cal.2d 378 [150 P.2d 196], affirmed 324 U.S. 548 [65 S.Ct. 770, 89 L.Ed 1171], rehearing denied 324 U.S. 890 [65 S.Ct. 1020, 89 L.Ed. 1438].) The opinions of the courts in those cases are referred to for a more complete statement of the facts leading to the review proceeding and to the issuance of the stay order involved on the present applications.

The purpose of the stay order, as stated therein, was to prevent the great and irreparable damage which would result to the company in the event of annulment, because it "would be unable to collect the difference between its present fare of seven cents per passenger and the fare of six cents per passenger" ordered by the commission. The company was required to file monthly reports showing the amounts received in excess of the reduced rate. It was also required to post a bond of $100,000 and to deposit with the clerk of this court on the first of each month during the pendency of the review proceedings a $100,000 Certificate of Indebtedness issued by the United States Government to be held subject to the order of this court "as further security to enforce the prompt payment by petitioner of all damages caused by the delay in the enforcement of said decision and order of the Commission and of all moneys any person may be compelled to pay petitioner for transportation pending review in excess of the charges fixed by said decision and order of the Railroad Commission, and of all moneys payable to the State of California, in the event said decision and order are affirmed." Section 68(d) of the Public Utilities Act empowers the court to order impounded any excess fares collected pending the period of the stay, "under such conditions as the court may prescribe."

The order contained the following further provisions:

"In the event that this court finally affirms said decision and order of the Railroad Commission, and in the further event that the persons entitled to a refund of the excess charges collected by petitioner during this review proceeding do not claim all of such excess charges or moneys within six months after final decision of this court, the State shall be entitled to all such excess charges or moneys which petitioner has unsuccessfully attempted to refund, to be paid to it under such terms and conditions as the court may hereafter prescribe.

"Acceptance by petitioner of the benefits of the stay hereby ordered shall be deemed an acceptance of and a consent to the terms and conditions prescribed herein.

"This court retains jurisdiction to alter, amend, modify. or supersede this order, on motion of either party, or on its own motion, as the interests of justice may require."

Following the affirmance of the commission's order and pursuant to the plan of publication and refund to passengers as ordered by this court on May 31, 1945, the company made

refunds to all who presented refund coupons, and the six months' period within which claimants might apply for refunds expired on December 31, 1945. The total amount of excess collected subject to refund was $705,794.96. Of that amount the sum of $12,014.45 was refunded to claimants, leaving $693,780.51 subject to disposition pursuant to the order of this court. The company has expended the sum of $5,028.93 for publication and other costs in making the refunds, and concerning which there is no controversy.

Since the issuance of the stay order and during the pendency of the review the city and county of San Francisco purchased all of the operative properties of Market Street Railway Company for the sum of $7,500,000, and on September 29, 1944, the transfer of the properties to the ownership of the city was consummated. The city thereupon commenced joint operation of the former company and the municipal lines and has continued such operation under a uniform seven cent fare.

The city now requests this court to modify its stay order by substituting the city and county of San Francisco in the place of the State of California as the recipient of the unrefunded portion of the excess fares. By its application Market Street Railway Company seeks to be discharged from any further liability in making refunds, to have the unrefunded moneys declared to be its property, and to be restored to possession of all impounded funds and securities on deposit. The state's opposition to both requests is based on its position that it is the lawful and proper recipient of the fund.

Preliminarily it is asserted by the state that the provisions of the order sought to be modified are final and may not now be disturbed. The state relies on the case of *Inland Steel Co.* v. *United States,* 306 U.S. 153, 156 [59 S.Ct. 415, 83 L.Ed. 557], as support for its contention that, the benefits of the stay order having been accepted and no objection having been made by the company or the city to the conditions therein provided, both the company and the city are now precluded from seeking a modification thereof. The basis upon which the contention rests, however, is the acceptance of the benefits of the stay order, and is therefore more properly addressed to the propriety of the application of the railway company on whose behalf the stay was granted. In any event the jurisdiction of this court to entertain the applications on their merits is not affected. The court expressly retained

jurisdiction to modify its order on the application of a party to the proceeding, or on its own motion. The retention of jurisdiction precludes the finality asserted by the state. It leaves the provisions of the order open to alteration or modification as the exigencies may require or justify. The excess fares are impounded funds in the custody of the court, although they are represented by the securities on deposit. (*Natural Gas Pipeline Co.* v. *Federal Power Com.*, 128 F.2d 481, 485.) This court has the power and the responsibility of protecting the fund and of disposing of it in accordance with the applicable principles of law and equity for the protection of the litigants and the public whose interests are affected by the final disposition thereof. The court is said to be free, in the discharge of that duty and responsibility, to use broad discretion in the exercise of its powers so as to avoid an unlawful or unjust result. (*United States* v. *Morgan*, 307 U.S. 183, 194 [59 S.Ct. 795, 83 L.Ed. 1211].)

Pursuant to its retained jurisdiction and its inherent power to dispose of the impounded moneys in accordance with the foregoing principles, this court will consider the merits of the claims of each of the parties and dispose of the fund in accordance with the law and the equities thus appearing. In this treatment the legal and equitable considerations presented by each claimant will be discussed separately.

*The Claim of Market Street Railway Company*

The company urges that the law and the equities favor its request. It contends that the excess is its property and that its legal ownership represents a claim superior to that of any other party. It cites *Illinois Bell Telephone Co.* v. *Slattery*, 102 F.2d 58, as support for a conclusion that a debtor and creditor relationship existed as between the company and the paying passengers which upon termination of the refunding period left the legal ownership of the balance in the company. In that case the court stated that a debtor-creditor relationship existed as between the utility and the rate payers under an order which provided that the utility should be released from all liability as to refunds which it was unable to make within the time limited. The court's observation was pertinent in denying the claim to the unrefunded balance made by the State of Illinois, which was not named in the order. The result there is not controlling in a case where, as here, there was no provision for release to the utility of an unclaimed balance.

Legal ownership is not a factor appearing in the present case. The Railroad Commission's order limited the fare to be collected to a six cent base. In the stay order it was recognized that the company should be entitled to the additional one cent for each fare collected pending review only if it prevailed and the commission's order was annulled. That the company should have no legal ownership in the excess in the event of affirmance was recognized in the stay order, namely, in the purpose to prevent loss to the company if the order should be annulled, and in the further provision for refund and disposition of the excess otherwise than to the company in the event of affirmance. The company necessarily accepted the conditions of the order by acceptance of the stay (*Inland Steel Co.* v. *United States, supra,* 306 U.S. 153, 156), and, in view of affirmance by this court and by the Supreme Court of the United States, it may not now win an amount on a claim of legal ownership to which it was never entitled either under the commission's order or the stay order of this court. Both this court and the Supreme Court of the United States have determined that the company has been accorded due process. It follows that the company was and is not entitled as of right to more than the six cent fare ordered by the commission.

The company bases its claim of equity on its financial statement for the seven months between March 1, 1944, and September 29, 1944 (the period of its operation pending review) showing an alleged operating loss, if operation be based on the six cent fare. Assuming the correctness of the result from the figures presented, it does not follow that the company is entitled to the undisposed of excess as a matter of equity. Neither the commission's order nor the stay order may be said to have guaranteed to the company an operating profit under the reduced fare. The reduction was calculated to increase the proportion of the traffic on the company lines, by rediverting to the company traffic which had previously been diverted to the municipal lines after the company had been granted a seven cent fare and the city continued to operate under a five cent fare. (See *Market St. Railway Co.* v. *Railroad Commission, supra,* 24 Cal.2d at p. 403.) The company contends that the commission's order was experimental. If so, the experiment was never tried because of the stay order issued at the instance of the company. Collection of the seven cent fare, even though a refund coupon was assumed to be available, was not a real test of the inauguration of a

six cent fare. By accepting the stay order, the company assumed the risk attendant upon a postponement of any such experiment, and because of the sale and transfer to the city prior to the affirmance of the commission's order it became certain that the experiment could not be initiated nor consummated. The company contends, however, that subsequent to the transfer the joint operation of the company and city lines under a uniform (seven cent) fare did not bring back to the company lines the proportion of the traffic which the commission calculated. Be that as it may, that result could not afford a criterion of what the division of traffic might have been under a uniform (six cent) fare and improved service had the company properties remained in private ownership. In the final analysis these arguments relate to the reasonableness of the rate order, which was a matter within the jurisdiction of the commission (*Pacific Gas & Electric Co. v. Railroad Com.*, 16 F.Supp. 884) subject to the review which has been accorded to the company. Parenthetically we note the inclusion of a retirement (depreciation) reserve of $562,500 in the company's financial statement for the seven months' period. In view of the city's acceptance of the company's offer on May 16, 1944, and the ultimate transfer of the properties to the city on September 29, 1944, it seems more appropriate, for the immediate purpose at least, to consider all reserves, accumulated during the seven months' period, with the exception of the excess fare reserve, to be merged in the price received for the capital assets. So considered, the figures show an operative gain rather than an operative loss. Otherwise considered, the substantial effect of recognizing the company's claim on that basis would be to permit it to add that figure to the price received for its capital assets. In view of the ultimate sale and transfer of the properties to the city, we do not perceive that any possible equities asserted by the company are superior to the equities presented by other claimants to the unrefunded portion of the excess fare fund.

### The Claim of the State of California

■ Prior to 1933 section 68(d) of the Public Utilities Act (Stats. 1915, p. 115; Deering's Gen. Laws, 1931, Act 6386) provided that in the event of the affirmance of an order reducing rates any unrefunded excess accumulated pending final disposition in review proceedings should be paid "into the state treasury for the benefit of the general fund." In 1933

(Stats. 1933, p. 1158; Deering's Gen. Laws, 1933 Supp., Act 6386) that subdivision of section 68 was amended by deleting the provision for payment of the unrefunded excess to the state. As the section now reads provision is made for refund to those who had contributed any portion of the excess, but no specific direction is made with reference to the disposition of the unrefunded portion of the excess.

Section 68 refers to public utilities generally. However, section 68.01 of the act (added by Stats. 1939, p. 2871; Deering's Gen. Laws, 1939 Supp., Act 6386), relating to toll-bridge corporation refunds, provides that the "State shall be entitled to all such moneys . . . which the toll-bridge corporation has unsuccessfully attempted to refund, which are not claimed" within the specified period. The new section was undoubtedly added to provide for such refunds as were involved in the Carquinez Straits bridge matter (see *American Toll Bridge Co.* v. *Railroad Com.* (Sept., 1938), 12 Cal.2d 184 [83 P.2d 1].)

It is contended by the company and by the city that the deletion of the similar provision in section 68 is tantamount to a legislative determination that the state is not entitled to the unrefunded portion of the moneys. This does not necessarily follow. The fact that the Legislature included the provision in respect to toll-bridge corporations indicates rather a recognition that the state is the natural beneficiary and recipient of the fund when the utility may be said to serve the people of the state generally. The equity in respect to toll-bridge refunds is therefore expressly declared by the Legislature. But the absence of a similar provision in respect to public utilities generally is consistent with the legislative determination to leave the disposition of unrefunded moneys to the sound discretion of the court or other body having jurisdiction to order it. The effect of the elimination of the escheat provision in section 68 is therefore a declaration by the Legislature in effect that the state is not entitled to the unclaimed moneys as a matter of right, and, as hereinbefore indicated, to place upon the court in this case the duty of disposing of the moneys as the rights or equities of the parties may appear. In the absence of a claimant having a greater right or equity, the provisions of section 68 as they now read would not preclude a disposition of the fund to the state on the ground that the equities of the case require it. But in view of our determination on the merits of the equities

on behalf of the city and county of San Francisco it is unnecessary to discuss at length other points raised in connection with the state's opposition to a modification of the order. It is sufficient to say that there appears to be no applicable principle of *bona vacantia* (in the absence of statutory escheat) to require disposition of the fund to the state as a matter of right. (*Illinois Bell Telephone Co.* v. *Slattery, supra,* 102 F.2d at p. 68.)

### *The Claim of the City and County of San Francisco*

The city participated in the proceedings before the Railroad Commission and no contention is made that it is not a proper party to move for a modification of the stay order. See *Bodinson Mfg. Co.* v. *California Employment Com.,* 17 Cal.2d 321, 331 [109 P.2d 935].) Pursuant to appropriate direction by the board of supervisors the city's motion for modification was filed in April, 1945, prior to the date of the order of May 31, 1945, setting up the plan for making refunds to the persons who had paid excess fares, but subsequent to its purchase of the physical properties of the railway company. After the stay order was made and before the expiration of the time when claims to the impounded moneys might be filed, the situation of the city was changed by the acquisition of the properties of Market Street Railway Company. That change justifies and requires this court, under its retained jurisdiction and the principles enunciated in *United States* v. *Morgan, supra* (307 U.S. 183), to consider the equities asserted by the city.

The city bases its claim for distribution to it of the unrefunded excess in part on its acquisition and operation of the properties of the railway company. The city refers to the greatly depleted and depreciated state of the properties, and to the condition of the roadbeds which alone necessitates the expenditure of over $1,600,000 to defray the cost of the repairs as to which the railway company was in arrears under its franchise at the time of sale and transfer. (See *Market Street Railway Co.* v. *Railroad Com., supra,* 24 Cal.2d at pp. 386, 402; also 324 U.S. at page 567.)

It is also contended that inasmuch as the people of the city paid the excess fares they are the natural beneficiaries thereof. It is urged that the disposition of the unclaimed portion of the fund to the city will effect in substance its return to those who collectively are charged with the main-

tenance of the railway property, namely the people of the city, for the benefit of all who may avail themselves of the transportation service; and that this will more nearly fulfil the intendments of the statutory provisions for refund. Tables are presented showing that but 12.82 per cent of all of the passengers carried on the street railway lines in San Francisco are assumed not to be residents of the city. With an unimportant exception the city operates all of the street railway lines in the city. Since the city is charged with the duty to operate the system for all of its patrons it must maintain it for outsiders as well as for the inhabitants of the city, all of whom are the beneficiaries of the transportation service. It thus appears that the showing of equity in favor of the city is particularly persuasive in view of the fact that the people of the city, who were for the most part the contributors to the fund, have now acquired the properties furnishing the service and are now responsible to the public for their operation. They are now interested in those properties in a proprietary as well as in a consumer capacity. In this respect they are doubly affected by the disposition of the unrefunded excess fares.

The transportation problems involved in this entire proceeding are essentially the city's problems. The people of the city are those principally concerned with their solution. The payment of the excess fares was made by them and their claim that the unrefunded balance be made available for improvement in the service is convincing. The city felt called upon to acquire the Market Street Railway system in such an outmoded and depreciated condition that it would require a vast expenditure of money to put it in repair and keep it in operation. The fund here involved was accumulated by what has been determined to be an unlawful exaction from the patrons of that system. In equity and good conscience it would seem that the fund should be made available for the benefit of those who were compelled to submit to this unlawful exaction even though most of them deemed it unnecessary or inconvenient to pursue the refunds, small individually, but very substantial in the aggregate. The individual refunds averaged about $2.00, and were made only on written application of the claimant under oath at the office of the company. Equitable considerations dictate that the people of the city, who contributed the moneys and who now own and operate the properties which furnished the service when the excess

fares were paid, are entitled to have them distributed for their benefit in the rehabilitation of the physical properties which were acquried during the pendency of the review proceeding, and for the improvement of the service afforded thereby. The distribution of the fund in that manner and its application to the purpose specified will inure to the benefit of those whose payments accumulated the fund, including both the people of the city and outsiders who have occasion to avail themselves of the service.

We therefore conclude that the equities urged by the city should be deemed paramount. Accordingly its application for modification of the stay order is granted.

It is ordered that the order of this court dated March 8, 1944, staying execution of the order of the Railroad Commission pending final determination of the review proceeding, be and the same is hereby modified by substituting and naming the city and county of San Francisco as the recipient of the unclaimed portion of the excess fares accumulated during the pendency of the review proceeding.

It is further ordered that upon receipt by the clerk of this court of a cashier's or a certified check in the sum of $688,751.58 (representing the sum of $693,780.51, the amount of the unclaimed excess fares, less the sum of $5,028.93, the company's expenses in making refunds), payable to the city and county of San Francisco, the clerk is directed to deliver to Market Street Railway Company's duly authorized representative the securities deposited by the company pursuant to the order of March 8, 1944, and to sign and accept signed mutual acknowledgments evidencing the completed transaction. Thereupon the Market Street Railway Company shall be deemed discharged from further liability under the stay order and the surety on its bond of $100,000 shall stand exonerated.

Gibson, C. J., Carter, J., Traynor, J., and Spence, J., concurred.

EDMONDS, J., Dissenting.—In my opinion, the Market Street Railway Company is entitled to retain the accumulated fund representing excess fares paid by its patrons. It is said that, because of the provisions of the stay order, the carrier may not successfully maintain a claim of legal ownership of

the money now in its possession. But by such an order, this court could not confiscate for the public property which the railroad might thereafter lawfully acquire, nor prevent passengers from abandoning to the corporation amounts paid in excess of the reduced rate during the time the order of the railroad commission was held in abeyance.

The Public Utilities Act specifies, in great detail, the procedure to be followed and the conditions which must be found by this court to exist as a prerequisite to the stay of an order or decision of the commission. (Stats. 1933, p. 1158; 2 Deering's Gen. Laws, Act 6386.) By the terms of section 68 of that statute, no stay order shall be made except upon five days' notice and after a hearing; the order suspending a decision of the commission ''shall contain a specific finding based upon evidence submitted to the court, and identified by reference thereto, that great or irreparable damage would otherwise result to petitioner and specifying the nature of the damage.'' (Subd. (b).) The court is given the power to grant a temporary stay before a hearing under specified circumstances and only for a limited time. The statute enumerates the conditions of such an order, provides for hearing at the earliest possible time, and requires the court to dissolve the temporary bar to enforcement if the petitioning party does not proceed with the application for a stay. (Subd. (c).)

The statute also declares that the order of the court is not to become effective ''until a suspending bond shall have first been executed and filed with and approved by the court . . . sufficient in amount and security to insure the prompt payment by the party petitioning for the review, of all damages caused by the delay in the enforcement of the order or decision of the commission and of all moneys which any person or corporation may be compelled to pay pending the review of the proceedings . . . in case said order or decision is sustained.'' If a public utility challenges a decision lowering rates, it may be directed, ''to pay into court from time to time, there to be impounded until the final decision of the case, or into some bank or trust company paying interest on deposits, under such conditions as the court may prescribe,'' all sums collected in excess of the rate fixed by the commission. (Subd. (d).)

Accounts showing the excess charges received by it during such period are to be kept by the utility. If the commission's order is upheld, all moneys which may have been collected at

a rate higher than that authorized by the order subjected to review, together with reasonable interest, shall be promptly paid to the corporations or persons entitled thereto in such manner, and through such methods of distribution, as may be specified. (Subd. (e).)

Although this court has power under the Constitution to issue a writ of *supersedeas* whenever it is necessary to protect the rights of the parties to an appeal and it cannot be deprived of that power by legislative enactment, there is no constitutional right to an appeal. That procedure is entirely statutory. The Legislature has complete authority to specify the requirement for a stay of execution pending an appeal. (*Trede* v. *Superior Court,* 21 Cal.2d 630, 634 [134 P.2d 745]; *United States* v. *Berg,* 202 Cal. 10, 13 [258 P. 942]; see *Ex parte Queirolo,* 119 Cal. 635 [51 P. 956]; *Foster* v. *Superior Court,* 115 Cal. 279 [47 P. 58]; *Phillips* v. *Patterson,* 34 Cal. App.2d 481 [93 P.2d 807].) In the absence of statutory regulation, ancillary terms, such as those specified in *United States* v. *Morgan,* 307 U.S. 183 [59 S.Ct 795, 83 L.Ed. 1211]; *Inland Steel Co.* v. *United States,* 306 U.S. 153 [59 S.Ct. 415, 83 L.Ed. 557], and similar cases, may be exacted as a prerequisite to the issuance of a stay order. But where, as here, the Legislature has conditioned the issuance of the writ "in the manner hereafter provided," the court may not go beyond the clearly prescribed legislative requirements and impose other conditions taking from a public utility property which it otherwise would own, or to which it might later acquire title. And, certainly, the provision allowing this court "in its discretion" to order the impounding or deposit of money collected in excess of the rates fixed by the commission "under such conditions as the court may prescribe" does not authorize the disposition of the accumulated fund without regard to legal ownership. It is obvious from a reading of the statute that the conditions which may be prescribed are those having to do with the place and form of the deposit, the time and manner of withdrawal, and other details of that kind.

A condition which exceeds these limitations violates the rule of law that a public utility is the owner of money collected by it in violation of a regulatory statute or order, subject to the right of the court to require the corporation to restore the excess charges to the rate payer. The repayment of such amounts may be ordered by the court in connection with its review of the commission's order and a consumer has

a cause of action for damages to recover excess charges paid by him. (See *California Adjustment Co.* v. *Atchison etc. Ry. Co.,* 179 Cal. 140 [175 P. 682, 13 A.L.R. 274]; *Southern Pacific Co.* v. *Superior Court,* 27 Cal.App. 240 [150 P. 397, 404]; *Central States Elec. Co.* v. *City of Muscatine,* 324 U.S. 138 [65 S.Ct. 565, 89 L.Ed. 801]; *United States* v. *Morgan, supra; Inland Steel Co.* v. *United States, supra; Spiller* v. *Atchison T. & S. F. R. Co.,* 253 U.S. 117 [40 S.Ct. 466, 64 L.Ed. 810]; *Erwin* v. *United States,* 97 U.S. 392 [24 L.Ed. 1065]; *Natural Gas Pipeline Co.* v. *Federal Power Com.,* 141 F.2d 27; *Natural Gas Pipeline Co.* v. *Federal Power Com.,* 128 F.2d 481; *Illinois Bell Telephone Co.* v. *Slattery,* 102 F.2d 58; *Bell* v. *United States,* 49 F.Supp. 505; 13 A.L.R. 289.)

The history of section 68 of the Public Utilities Act, *supra,* clearly shows that the state has changed its originally declared policy in regard to excess unrefunded charges of a public utility. When that statute was enacted, it provided for payment of such amounts to the state. In 1933 the provision was stricken out. (Stats. 1933, p. 1158; Deering's Gen. Laws, 1933 Supp., Act 6386.) By that action, and the later amendment relating to refunds by a toll bridge corporation (Public Utilities Act, *supra,* § 68.01; added by Stats. 1939, p. 2871; Deering's Gen. Laws, 1939 Supp., Act. 6386) the state relinquished the right by escheat to excess charges of public utilities generally. In the absence of an escheat statute, a railroad corporation is entitled to retain unclaimed excess charges either upon the theory of legal ownership or upon the common law doctrine of abandoned property.

Justification for taking from the Market Street Railway Company the accumulated excess fares is placed upon the ground that the stay order of this court was a determination, adverse to the corporation, upon the issue of ownership of the overcharges collected by it during the pendency of the review and not claimed by the passengers. Upon the authority of *Inland Steel Co.* v. *United States, supra,* it is said that the carrier "necessarily accepted the conditions of the order by the acceptance of the stay." However, the facts of that case are quite different from those shown by the record now before this court, and the decision concerned only the conflicting claims of a shipper and the carrier which had been subjected to a regulatory order.

The litigation arose when the steel company sued to set aside an order of the Interstate Commerce Commission re-

straining Indiana Belt Railroad Company from paying allowances for spotting cars. The district court "suspended, stayed and set aside" the commission's decision pending a hearing of the case. Upon stipulation of counsel for the steel company, the interlocutory injunction provided that, until further order, the railroad company should set up on its books of account any and all sums in controversy, the amount claimed by the shipper to be paid to it "or canceled" only upon final determination of the case.

In later proceedings, the court dismissed the suit for want of equity, dissolved the injunction, and ordered the railroad company to retain the accrued allowances. The United States Supreme Court affirmed that determination. Answering the steel company's claim to the fund, it decided that a court of equity has inherent power to impose terms and conditions upon a litigant who seeks its aid. Otherwise, said the court, rights may be impaired or cut off while a challenged order is stayed. But there was no holding that, by either a stay order or final decree, a fund accumulated pending a determination as to the validity of a rate regulation may be given to the public; indeed, the decision recognized that the money which was set aside under the injunction of the district court belonged either to the shipper, who stood in the position of the passengers of the Market Street Railway Company, or to the carrier. It should also be noted that the district court, in fixing the terms of its interlocutory injunction, was not acting under a statute such as the Public Utilities Act, *supra,* which specifies the conditions which may be included in a stay order. Of equal importance is the fact that the steel company expressly accepted the terms of the injunction.

The right to impounded funds was also a question at issue in *United States* v. *Morgan, supra,* but that decision is not authority for the conclusion reached in the present litigation. Morgan and others, conducting market agencies, sued to set aside a schedule of maximum rates to be charged for stockyard services. The United States Supreme Court held the order invalid for want of due procedure and remanded the case for further proceedings.

By the remand, the secretary of agriculture was left free to take such further proceedings as the statute permitted. Motion to stay proceedings until he should enter a final order was denied by the district court, and an appeal was taken from an order granting a countermotion by appellees to dis-

tribute the fund among them. The only holding as to the money accumulated by the payment during the litigation of the challenged rates was that it should be retained pending a final determination by the secretary of agriculture in the reopened proceedings. (307 U.S. 198.) Neither the right of any particular person to the fund nor the authority of the court to order the payment to the public of charges collected in excess of the regulation under review was presented to or considered by the court.

Abandonment of property occurs when the owner voluntarily relinquishes it without vesting title in any particular person and with the intention of terminating his ownership, possession, and control. (See *Moon* v. *Rollins*, 36 Cal. 333 [95 Am.Dec. 181]; *Peal* v. *Gulf Red Cedar Co.*, 15 Cal.App.2d 196 [59 P.2d 183]; 1 C.J.S. 4; 1 Am.Jur. 2.) Although a state may by statute claim abandoned or unclaimed property (see Public Utilities Act, *supra*, § 68.01; Code Civ. Proc., § 1268 et seq.; Abandoned Property Act, Code Civ. Proc., § 1274.1 et seq.; *Commonwealth* v. *Dollar Savings Bank*, 259 Pa. 138 [102 A. 569, 1 A.L.R. 1048]), in the absence of an appropriate statute of escheat, title is acquired by the first occupant, or by the first finder, who reduces it to possession. Such person thereupon obtains an absolute property therein by virtue of an actual taking with the intent to reduce it to possession. (See 1 Am.Jur. 3; 1 C.J.S. 18.) But abandonment results only when the intention to part with the ownership accompanies the act of relinquishment. (See 1 Am.Jur. 4; 1 C.J.S. 8.) The railway company, therefore, became the legal owner of the excess fares paid by passengers who either refused refund slips or failed to claim the overcharges within the time specified by this court in its order fixing the conditions upon which repayment should be made. And assuming that the accumulated money constitutes an impounded fund in the custody of the court, the possession of it, so far as the doctrine of abandonment is concerned, was and is in the company.

Furthermore, applying the common law rule that the real party in interest is the proper party to maintain an action for the recovery of excessive charges, it has been held that although a shipper, who occupies the same position as a passenger of Market Street Railway Company, may maintain an action to recover overcharges unlawfully exacted from him by a common carrier, the state, and upon principle its subdivisions, including municipalities, have no right to recover

on behalf of individual shippers the amounts paid by them in excess of established rates. (*State* v. *Chicago & A. R. Co.*, 265 Mo. 646 [178 S.W. 129, L.R.A. 1916C 309]; 13 A.L.R. 299.) I would, therefore, exonerate the sureties on the bond of the Market Street Railway Company and direct the clerk of this court to deliver to the carrier the securities deposited by it pursuant to the stay order.

Schauer, J., concurred.

Petitioner's application for a rehearing was denied July 15, 1946.

Edmonds, J., and Schauer, J., voted for a rehearing.