**DEMOCRATIC CENTRAL COMMITTEE OF the DISTRICT OF COLUMBIA, et al., Petitioners,**

v.

**The WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent,**

D.C. Transit System, Inc., Intervenor.

Nos. 21865, 24398, 24415 and 24428.

United States Court of Appeals, District of Columbia Circuit.

May 31, 1996.

Leonard N. Bebchick, Washington, DC, for Washington Metropolitan Area Riders' Fund.

Landon G. Dowdey, for Democratic Central Committee of the District of Columbia, et al.

Lutz Alexander Prager, Assistant Deputy Corporation Counsel, for the District of Columbia.

Bruce P. Heppen and Karen S. Karas, Assistant General Counsel, for intervenor Washington Metropolitan Area Transit Authority.

Before: BUCKLEY, RANDOLPH and TATEL, Circuit Judges.

PER CURIAM:

On November 30, 1995, this court issued an order directing NationsBank Trust Company, N.A., the Bank of New York's predecessor as trustee of the Riders' Fund, to solicit recommendations regarding the disposition of the Riders' Fund and the Bebchick Fund (collectively, the "restitutionary funds"). After reviewing the recommendations, the court has decided to consolidate the Riders' Fund and the Bebchick Fund pursuant to Article Two of the Riders' Fund Trust Agreement, *see Democratic Cent. Comm. of the District of Columbia v. Washington Metro. Area Transit Comm'n*, 41 F.3d 757, 758–59 (D.C.Cir.1994), and to transfer all the assets of the restitutionary funds, both liquidated and unliquidated, to the Washington Metropolitan Area Transit Authority ("WMATA"), subject to the following two conditions: first, the restitutionary funds must not be the basis for any reduction in the contributions due from the jurisdictions that fund WMATA; and second, with two exceptions noted below, the funds must be spent exclusively to purchase new buses in accordance with WMATA's January 19, 1996 letter to Leonard Bebchick, Esquire.

## I. BACKGROUND

### A. Regulatory Authority Over Bus Service

In 1960, Congress gave its consent to Virginia, Maryland and the District of Columbia (the "signatories") to enter into the Washington Metropolitan Area Transit Regulation Compact (the "Compact"). Pub.L.No. 86–794, tit. I, 74 Stat. 1031, 1031–35 (1960) (codified as amended at D.C. CODE ANN. § 1–2411 (1992)). The Compact established the Washington Metropolitan Area Transit Commission (the "Commission") and gave it regulatory authority over, *inter alia*, privately owned bus companies providing passenger transportation services in the metropolitan area. *Id.*

In 1966, Congress and the signatories added a third title to the Compact, establishing WMATA but expressly prohibiting it from performing, directly or through a contractor, transit service by bus. Washington Metropolitan Area Transit Authority Compact ("Title III"), Pub.L.No. 89–774, tit. III, art. XIII, 80 Stat. 1324, 1344 (1966) (codified as amended at D.C. CODE ANN. § 1–2431(1992)). Congress lifted this prohibition in 1972 when it amended Title III. National Capital Area Transit Act of 1972 (the "Act"), Pub.L.No. 92–517, 86 Stat. 999 (1972). The Act directed WMATA to initiate negotiations with, among others, D.C. Transit System, Inc. ("D.C. Transit") for the acquisition of its capital stock or its transit facilities used in connection with bus service in the Washington metropolitan area. Pub.L.No. 92–517, § 102(a), 90 Stat. 999, 1001. Since the acquisition of the bus companies, WMATA has been exclusively responsible for the provision of trans-

portation services by bus in the metropolitan area.

## B. The Restitutionary Funds

### 1. The Bebchick Fund

The history of the Bebchick Fund begins in 1968 when this court set aside three Commission orders increasing D.C. Transit's fares and ordered the company to make restitution to the bus riders in the Washington metropolitan area for excessive fares collected. *See Williams v. Washington Metro. Area Transit Comm'n*, 415 F.2d 922, 938–43 (D.C.Cir.1968), *cert. denied*, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969); *see also Bebchick v. Washington Metro. Area Transit Comm'n*, 485 F.2d 858, 860–61 (D.C.Cir. 1973). In 1974, representatives of the bus riders sought to collect the restitution due them from condemnation proceeds belonging to D.C. Transit then under the control of the United States District Court for the District of Columbia. In an order dated December 19, 1974, the district court distributed to D.C. Transit all but $1,461,756 of the condemnation proceeds, retaining that amount in an account until all appeals of the restitution award were settled.

This court assumed custody of the account containing the withheld condemnation proceeds, known as the "Bebchick Fund," by order dated December 2, 1975. In 1979, all appeals of the restitution award became moot when D.C. Transit agreed that the bus riders were entitled to the Bebchick Fund as restitution for excessive fares it had charged them. By 1986, all issues regarding the restitution owed the bus riders in connection with the excessive fares in this case had been settled. *See Bebchick v. Washington Metro. Area Transit Comm'n*, 805 F.2d 396, 399–401 (D.C.Cir.1986). As of April 30, 1996, the Bebchick Fund contained $6,560,588.17. This court has never relinquished custody of the Bebchick Fund, nor has it ever appointed a trustee for the fund.

### 2. The Riders' Fund

The Riders' Fund was established pursuant to a compromise agreement, approved by this court's order of February 26, 1990, wherein D.C. Transit agreed to pay $9,200,-000 in restitution into the Riders' Fund for the benefit of bus riders. *See Democratic Cent. Comm. of the Dist. of Columbia v. Washington Metro. Area Transit Comm'n*, 3 F.3d 1568, 1569 (D.C.Cir.1994). This court also adopted and executed a declaration of trust agreement, effective as of February 26, 1990, which, *inter alia*, appointed a trustee of the Riders' Fund to make "all reasonable efforts to collect all amounts to which the Trust is or becomes entitled and to realize the fair value of the Trust Assets." *Democratic Cent. Comm. of the Dist. of Columbia*, 41 F.3d at 759. On March 30, 1993, the Riders' Fund obtained a judgment against D.C. Transit in the amount of $4,976,124.79, the balance of unpaid restitution. The Bank of New York is currently trustee of the Riders' Fund. As of April 30, 1996, the Riders' Fund contained $4,850,459.80. The nonliquidated assets of the Riders' Fund consist of various interests in real estate and the judgment against D.C. Transit that the trustee is currently seeking to enforce.

On November 30, 1995, this court issued an order to the trustee of the Riders' Fund "to solicit, on behalf of the Riders' Fund and the Bebchick Fund, ... recommendations of the plaintiffs, the Washington Metropolitan Area Transit Commission [WMATA], the District of Columbia Government, and existing organizations representing users of mass transit services in the D.C. area as to the best disposition of these assets." In response to the trustee's solicitation, the court received sixteen recommendations.

## II. Discussion

Of the many recommendations submitted to the court regarding the disposition of the restitutionary funds, none suggested giving the farepayers an opportunity to prove and collect the amounts they were overcharged by D.C. Transit. Although a proof-of-claim procedure might usually be considered the most precise and direct method of compensation, the parties, special interest groups, and individual citizens that submitted recommendations correctly recognized that using such a procedure in this case would not be feasible. More than a quarter of a century has

passed since D.C. Transit collected the excessive fares; identifying, locating, and notifying all those overcharged after so much time would be very difficult, if not impossible. The prohibitive cost of notification, together with the cost of distribution, would greatly reduce, or even exceed, the total amount of the funds. Even if such an opportunity were given, it is doubtful whether any of the overcharged farepayers would avail themselves of it; many would likely consider the potential of recovering a small award not worth the considerable effort of establishing a claim arising out of numerous minor transactions that occurred 25 years ago. *See Market St. Ry. v. Railroad Comm'n*, 28 Cal.2d 363, 171 P.2d 875 (1946) (claims by street-car riders for fare overcharges amounted to less than two percent of fund consisting of fare overcharges). Because of the great cost and likely failure of a proof-of-claim procedure, another method of distributing the restitutionary funds is needed to benefit the overcharged farepayers.

■ In class actions, some courts have applied the equitable doctrine of cy pres to undistributed damage or settlement funds.[1] *See State v. Levi Strauss & Co.*, 41 Cal.3d 460, 224 Cal.Rptr. 605–611, 715 P.2d 564, 570 (1986). That doctrine permits such funds to be distributed to the "next best" class when the plaintiffs cannot be compensated individually. The object of applying the funds to the "next best" class is to parallel the intended use of the funds as nearly as possible by maximizing the number of plaintiffs compensated. *See* DeJarlais, *supra* note 1, at 740; Stewart R. Shepherd, Comment, *Damage Distribution in Class Actions: The Cy Pres Remedy*, 39 U. CHI L. REV. 448, 457 (1972). In the context of class actions, the cy pres doctrine is referred to as "fluid recovery."[2] The "next best" class in this case would be the current bus riders in the service region from which the excessive fares were collected. *See* Shepherd, *supra*, at 458 n. 44.

■ Fluid recovery offers four approaches to the distribution of unclaimed settlement or damage funds: (1) reduction of the defendant's prices, (2) escheat to a governmental body for either specified or general purposes, (3) establishment of a "consumer trust fund," and (4) "claimant fund sharing." *See Levi Strauss*, 224 Cal.Rptr. at 612, 715 P.2d at 571. Under the price reduction approach, the price of the defendant's product or service is lowered until the funds are completely distributed. *Id.* This approach is "particularly effective for remedying overcharges on items which are repeatedly purchased by the same individuals." *Id.; Bebchick v. Public Utils. Comm'n*, 318 F.2d 187, 204 (D.C.Cir.1963), *cert. denied*, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1969) (fund consisting of revenues from improperly granted rate increase used to keep fares down on behalf of current riders). Because of the inability to predict or control its effect

1. The term "cy pres" is derived from the Norman French expression *cy pres comme possible*, which means "as near as possible." The cy pres doctrine is a rule of construction used to preserve testamentary charitable gifts that otherwise would fail. When it becomes impossible to carry out the charitable gift as the testator intended, the doctrine allows the "next best" use of the funds to satisfy the testator's intent "as near as possible." Natalie A. DeJarlais, Note, *The Consumer Trust Fund: A Cy Pres Solution to Undistributed Funds in Consumer Class Actions*, 38 HASTINGS L.J. 729, 730 (1987).

2. Implementing fluid recovery, also referred to as "fluid class recovery," in federal class actions is controversial. DeJarlais, *supra* note 1, at 738 & n. 62. In *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005 (2d Cir.1973), *vacated on other grounds*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), the Second Circuit held that the class-wide damage assessment utilized in fluid recovery violates due process and that reading fluid recovery into Rule 23 of the Federal Rules of Civil Procedure improperly alters substantive rights in violation of the Rules Enabling Act. The Fourth and the Ninth Circuits have relied on *Eisen* to disallow fluid recovery distribution methods in class actions. *See Windham v. American Brands, Inc.*, 565 F.2d 59, 72 & n. 41 (4th Cir.1977), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978); *Kline v. Coldwell Banker & Co.*, 508 F.2d 226, 233–34 (9th Cir. 1974). Others have argued that the use of separate trials for liability and damages in fluid recovery deprives defendants in class actions of their seventh amendment right to trial by jury. William H. Simon, *Class Actions—Useful Tool or Engine of Destruction?*, 55 F.R.D. 375, 385–86 (1973). State courts, in particular California, have been more hospitable to fluid recovery in class actions. This case, however, is *not* a class action; the constitutional challenges mentioned above are not at issue here.

on a market, the price reduction approach is most appropriate in cases where the defendant is a monopoly. *See Levi Strauss,* 224 Cal.Rptr. at 613, 715 P.2d at 572; Shepherd, *supra,* at 462. None of the recommendations submitted to the court suggested this approach for distributing the restitutionary funds.[3]

■ There are two forms of the governmental escheat approach: the specified or "earmarked" escheat and the general escheat. *Levi Strauss,* 224 Cal.Rptr. at 613, 715 P.2d at 572. Under the former, funds are disbursed to a particular governmental agency for the purpose of benefiting a group of persons who approximate the injured class; the details of the distribution are left to the agency. *See id.* The advantage of the earmarked escheat is that it utilizes governmental agencies to administer the fund. *Id.* Under the general escheat, the funds are unconditionally deposited into the treasury of a governmental body for the benefit of the public at large. *Id.* Because this approach provides the least focused compensation to the injured class, it is used only when a more precise method cannot be found. *Id.* 224 Cal.Rptr. at 613–14, 715 P.2d at 572–73; De-Jarlais, *supra* note 1, at 753. Of the recommendations submitted to the court, five suggested that all of the restitutionary funds should escheat to WMATA; one suggested that WMATA should only get the liquid assets.[4] None of the recommendations suggested a general escheat.

■ The third available approach is the establishment of a "consumer trust fund." *Levi Strauss,* 224 Cal.Rptr. at 614, 715 P.2d at 573. Like the governmental escheat, the consumer trust fund can be arranged in two ways: the foundation method or the existing organization method. Under the former, the court appoints a board of trustees and deposits the funds with them. *Id.* The trustees then create an organization through which it finances projects beneficial to the injured consumers and those similarly situated. *Id.* The second method of establishing a consumer trust fund is to provide funding to an existing organization to support new and ongoing projects. DeJarlais, *supra* note 1, at 760. Like the earmarked escheat, the advantage of this second method is that it minimizes administrative costs by utilizing existing programs. *Levi Strauss,* 224 Cal.Rptr. at 614, 715 P.2d at 573; DeJarlais, *supra* note 1, at 760. Two recommendations suggested the creation of committees to oversee the distribution of restitutionary funds;[5] one suggested distributing a portion of the restitutionary funds to two existing transportation public interest groups.[6]

■ The final approach is "claimant fund sharing," which allows class members who submit claims to divide the funds pro rata. *Levi Strauss,* 224 Cal.Rptr. at 614, 715 P.2d at 573. While this approach compensates all who submit legitimate claims, unidentified class members do not receive any compensation, even indirectly. *Id.* The larger the number of unidentified class members, the greater the likelihood that those submitting claims will receive a windfall. This approach is, therefore, most appropriate where a large proportion of the class members participate and submit accurate claims. *Id.;* DeJarlais, *supra* note 1, at 756. None of the recommendations suggested this approach.

■ In determining which of the four approaches to employ, we consider the following factors: (1) the amount of compensation to class members, (2) the proportion of the class members sharing in the recovery,

---

3. Action for Community Transportation ("ACT") suggested that $3.5 million of the restitutionary fund be used to reduce the bus and rail fares between 5:30 a.m. and 6:30 a.m. from rush hour rates to non-rush hour rates. Kathleen Berkowitz, a member of WMATA's Elderly and Handicapped Advisory Committee and MetroAccess subcommittee, suggested in her recommendation that a part of the restitutionary funds go to subsidize those who find the MetroAccess rate a financial hardship.

4. *See* Recommendations of Democratic Central Committee of the District of Columbia, the Black United Front, the Government of the District of Columbia (liquid assets only), Barbara Young, and WMATA.

5. *See* Recommendations of Leonard N. Bebchick and MetroWatch.

6. *See* Recommendation of ACT.

(3) the extent to which nonclass members will benefit, and (4) the cost of the administration. *Levi Strauss,* 224 Cal.Rptr. at 614, 715 P.2d at 573; *see also* Shepherd, supra, at 464.

■ Our initial conclusion is that we should not use the general escheat or the claimant fund sharing approaches to distribute the restitutionary funds; the former because a more precise distribution approach is available, the latter because of the notification and proof difficulties discussed earlier. After evaluating the remaining approaches, we further conclude that an earmarked escheat to WMATA to implement its January 19, 1996 proposal is the best method of distributing the restitutionary funds to the "next best" class, the current bus riders.

Today's decision is not the first time this court has utilized a fluid recovery distribution approach to distribute a settlement fund consisting of D.C. Transit fare overcharges. In *Bebchick v. Public Utilities Commission,* 318 F.2d at 204, plaintiffs challenged an order issued by the Public Utilities Commission ("PUC") authorizing an increase in D.C. Transit's fares. This court invalidated the order and required D.C. Transit to create a special account or fund in the amount of the overcharges. *Id.* at 203–04. The use and disposition of the fund were committed to PUC's discretion, to be "exercised consistently with the purpose of benefiting [D.C.] Transit users in any rate proceedings pending or hereafter instituted." *Id.* at 204. Here, as in *Bebchick,* settlement funds are being distributed by means of fluid recovery even though neither was a class action.

In *Market Street Ry. Co. v. Railroad Commission,* 171 P.2d at 881, the California Supreme Court concluded, as do we, that an earmarked escheat to a government entity responsible for transit is the most effective way to distribute a settlement fund consisting of transit fare overcharges. After upholding a rate reduction, the California Supreme Court ordered a privately owned railway company to refund over $700,000 of fare overcharges. The riders were given an opportunity to collect refunds, but less than $13,000 was collected. *Id.* at 877. As happened in this case, the privately owned railway company became city-owned sometime after the excessive fares were collected. The City of San Francisco claimed it was entitled to the money because it was the successor of the railway company and because disposition of the money to it would benefit the riders. *Id.* at 881. The court ordered the money transferred to the City for the benefit of overcharged riders, directing that it should be used to improve property and services.

Using WMATA to distribute the funds makes sense: it has been providing bus transportation for over twenty years; its experience in serving the intended beneficiaries of the restitutionary funds is unparalleled; it is experienced in overseeing and administering large sums of money; it has an administrative infrastructure capable of beginning distribution immediately; and because virtually all of the funds will go to the benefit of the bus riders, the cost of administering the restitutionary funds will be negligible.

Distributing the restitutionary funds through the consumer trust fund approach would not be as effective or efficient. Any trustees the court could appoint would lack WMATA's experience in, and knowledge of, bus transportation services. In addition, administrative costs of creating a new organization, relative to WMATA's administrative costs, would be substantial. *See* Shepherd, *supra,* at 458 n. 43. The existing public interest groups, MetroWatch and ACT, also lack WMATA's experience and knowledge.

Distributing the restitutionary funds through the price reduction approach would effectively deliver the funds to the current bus riders. The benefit, however, would be extremely diffused and could be difficult to administer because WMATA would have to determine the precise point the funds would be exhausted.

■ Two recommendations argue that the interests of WMATA conflict with the interests of the bus riders and that the restitutionary funds should not, therefore, be transferred to WMATA. We find no conflict. In its recommendation, ACT neither identifies nor describes the alleged conflict; it merely surmises that one exists from three facts: (1) the funds originated in litigation in

which the riders were the plaintiffs and the transit operator was defendant; (2) the riders and WMATA have been represented by their own counsel; and (3) the riders' property and awards have been segregated from those of WMATA. ACT Recommendation at 3. ACT's first assertion is incorrect; the restitutionary funds originated in litigation between the riders and the Commission, in the case of the Riders' Fund, and the riders and the Public Utilities Commission, in the case of the Bebchick Fund. The Commission and PUC regulated transit fares and services, balancing the riders' interest in safe, adequate, and inexpensive public transportation with the privately-owned transit operators' interest in a profit. The interests of the riders conflicted with those of the transit operators, but not with the interests of the Commission and PUC. Indeed, this court stated that "the Commission, in administering the [settlement fund] acts more nearly as a trustee to implement judicial directives concerning the use of the fund than in the statutory regulatory powers." *Williams v. Washington Metro. Area Transit Comm'n*, 415 F.2d at 957 n. 199; *Bebchick v. Public Utils. Comm'n*, 318 F.2d at 204 ("The utilization and disposition of the fund . . . shall be left to the discretion of the Commission having regulatory authority with respect to [D.C.] Transit. . . ."). Like its predecessors, WMATA shares the riders' interest in safe, adequate, and inexpensive public transportation but not the transit operators' conflicting interest in making a profit. As for the remainder of ACT's argument, separate counsel and segregated property might well be characteristic of parties whose interests conflict, but they do not, in and of themselves, establish that a conflict exists.

Mr. Bebchick opposes transferring the restitutionary fund to WMATA "because of the inherent, and in this instance, manifest conflict of interest." Bebchick Recommendation at 4. Like ACT, Mr. Bebchick neither identifies nor describes the conflict he alleges; unlike ACT, however, he offers no facts in support of his allegation. All he offers is a quotation that, if read in the original, warns of the conflict of interest risks in private, not public, organizations.

Finally, both ACT and MetroWatch expressed concern that applying the funds to WMATA's operating budget would result in a commensurate decrease in the contributions from the jurisdictions that fund WMATA. The conditions to which the escheat is subject should allay their concerns. *Levi Strauss*, 224 Cal.Rptr. at 613 n. 10, 715 P.2d at 572 n. 10.

Nearly all the recommendations submitted contained at least one suggestion on how all or part of the restitutionary funds should be specifically allocated. Although many had merit, it is not our function to supervise or dictate WMATA's budget. It is for this reason that, once the transfer of the restitutionary funds is accomplished, the court will no longer retain jurisdiction over this matter.

Nonetheless, to assure that the restitutionary funds are used in a manner that most closely serves their original purposes, the escheat to WMATA is subject to the following two conditions. First, the restitutionary funds cannot be the basis for any reduction in the contributions due from the jurisdictions that fund WMATA. Second, with two exceptions mentioned below, WMATA must use the funds, as it has proposed, exclusively for "the purchase of new buses for use in the affected service area." Letter from Polk to Bebchick of 1/19/96 at 1. As WMATA explained, purchasing new buses would provide

widespread, long-lasting and tangible benefits for the farepaying public, . . . [including] improved service, increased safety, reduced operating costs, lower maintenance costs, improved environmental performance, and standard features to aid the elderly and disabled.

*Id.* at 2. While the funds must be spent primarily for new buses, we recognize that WMATA will inherit responsibilities from the current Riders' Fund trustee, the Bank of New York. Accordingly, we also authorize WMATA to use a reasonable portion of the restitutionary funds to cover the cost of (i) liquidating the real property assets in the Riders' Fund (including the cost of such legal and real estate services as it may deem appropriate to help realize the assets' poten-

tial value) and (ii) prosecuting the judgment the Riders' Fund has against D.C. Transit.[7]

### III. CONCLUSION

We conclude that the Riders' Fund and the Bebchick Fund should be consolidated pursuant to Article Two of the Riders' Fund Trust Agreement, *see Democratic Cent. Comm. of the Dist. of Columbia v. Washington Metro. Area Transit Comm'n,* 41 F.3d at 758–59, and that all the assets of the restitutionary funds, both liquidated and unliquidated, be transferred to WMATA, subject to the conditions described above. WMATA is directed within sixty days to submit implementing orders to the court.

*So ordered.*

---

7. The court strongly suggests that, before liquidating the real property assets of the Riders' Fund, WMATA consult with the Bank of New York about maximizing the potential value of the property. WMATA should also make arrangements for assuming responsibility for prosecuting the judgment the Riders' Fund has against D.C. Transit.