# Lieberman v. Howard Johnson's Inc. (No. 1)

130

*Steven M. Feldman,* for plaintiff.

*Richard E. McDevitt,* for defendant Howard Johnson's, Inc.

*Edward I. Swichar,* for defendant Atlantic Richfield Co.

*Benjamin M. Quigg, Jr.,* for defendant Humble Oil & Refining Co.

*Hoyt H. Harmon and Arthur L. Vangeli,* for defendant Gulf Oil Corp.

ANDERSON, J., June 29, 1973.—Preliminary objections have been filed to a complaint in equity in the above matter instituted by plaintiff on his own behalf, and as a class action on behalf of all other users of the Pennsylvania Turnpike who have purchased, or will in the future purchase, gasoline, motor fuel, motor oils and food from any or all of defendants at prices allegedly in excess of the retail prices prevailing in the vicinity of defendants' turnpike establishments.

In essence the complaint alleges that pursuant to lease agreements with the Pennsylvania Turnpike Commission (Turnpike Commission), the Atlantic-Richfield Company (Atlantic)[1], Humble Oil and Refining Company (Humble), and the Gulf Oil Corporation (Gulf), were granted the exclusive right to operate gas stations and restaurant facilities at various locations along the Pennsylvania Turnpike in the Commonwealth of Pennsylvania. The lease contracts provide, inter alia, that the prices at which gasoline, motor fuel, motor oils and food should be sold from the various demised premises should not be in excess of the retail prices charged in the vicinity.

The complaint further alleges that under the lease agreements the three oil companies were permitted to sublet the various demised premises with the approval of the Turnpike Commission and that, pursuant there-

---

[1] In 1953 at the time the lease agreement was entered into, the company was known as the Atlantic Refining Company. In 1966, after merging with the Richfield Oil Company, its name was changed to the Atlantic-Richfield Company. This name was retained following a merger with the Sinclair Oil Company in 1970.

to, they had subleased the various restaurant facilities to defendant, Howard Johnson, Inc. (Howard Johnson) and that under those subleases Howard Johnson was likewise required to sell food at prices not in excess of the retail prices prevailing in the vicinity.

The complaint further alleges that because the Pennsylvania Turnpike is a limited access toll highway with entrances and exits spaced at such distances as to make it impractical for users of the turnpike to obtain gasoline, motor fuel, motor oil and food at facilities other than those operated by the respective defendants along the turnpike, and because of the spacing of these facilities, defendants enjoy an exclusive monopoly with no control on the prices they can charge other than the provisions of the aforementioned leases and subleases.

It is further alleged that the provisions relating to the prices to be charged by defendants are intended for the benefit of the users of the turnpike and exist to protect them from an allegedly monopolistic position enjoyed by defendants. The complaint then contends that the users of the Pennsylvania Turnpike are third-party beneficiaries under the said lease and sublease agreements.

The complaint further alleges that at the time of, and for a period of six years prior to the filing of, the present action, plaintiff had been a regular user of the Pennsylvania Turnpike, that he had been compelled to make use of the facilities operated by defendants for the purchase of gasoline, motor oil, foods and other substances, that plaintiff and other users of the turnpike had been repeatedly and consistently overcharged by defendants since the inception of the leases and subleases, and that the present action was brought as a class action on his own behalf and on behalf of all other users of the Pennsylvania Turnpike

who had in the past or would in the future purchase the foregoing items from defendants at their respective facilities along the Pennsylvania Turnpike.

It is alleged that all users of the Pennsylvania Turnpike who had in the past or would in the future purchase the foregoing items from the various defendants at their facilities along the Pennsylvania Turnpike constitute a class of persons similarly situated and so numerous as to make it impractical to join all of them as parties. Plaintiff also alleges that he can adequately represent the interests of the entire class.

The relief prayed for is that the individual defendants be permanently enjoined from further breaches of their lease and sublease agreements; that each member of the class be awarded compensatory and punitive damages in an amount in excess of $10,000; that the court award attorney fees and costs of suit; together with a general prayer for additional relief.

The three oil companies have filed preliminary objections to the complaint. They are essentially similar and may be summarized as follows:

I. The complaint fails to state a cause of action upon which relief can be granted in that plaintiff and the class which he purports to represent lack capacity to sue and are not third-party beneficiaries under the lease contracts and subcontracts;

II. The class action is not a proper device because: the users of the turnpike purchase different items from the three oil company defendants, and any alleged claims of the users would vary among themselves and among the various defendants; the class which would be involved in the litigation would be so large and unknown that it would be unmanageable;

III. The complaint is vague and is lacking in particularity and fails to allege specifically the names of the sellers, their locations and the specific transactions

which allegedly constitute a violation of the terms of the lease agreements;

IV. Plaintiff has misjoined defendants in that any right to relief does not arise out of the same transaction, occurrence or series of transactions or occurrences;

V. Plaintiff has failed to set forth a cause of action or to allege any facts supporting a claim for punitive damages;

VI. Plaintiff has misjoined causes of action in law and equity by seeking monetary damages, since the primary relief sought is damages and the equity relief sought is merely incidental; and that plaintiff has a full, adequate and complete remedy at law.

VII. Defendant Atlantic asserts that it has sublease agreements with parties other than Howard Johnson, and that these sublessees have not been joined, and are necessary parties to this action.

The preliminary objections filed by defendant, Howard Johnson, are essentially the same as the first six objections set forth above, with the additional factor that the company had not contracted directly with the Pennsylvania Turnpike Commission but instead operates under subleases with the three oil company defendants.

For the purpose of disposing of defendants' preliminary objections, all facts averred in the complaint, other than conclusions and statements of law, are to be considered as admitted. "Moreover, when the sustaining of defendants' preliminary objections will result in a denial of plaintiffs' claim, or a dismissal of plaintiffs' suit, preliminary objections should be sustained only in cases which are clear and free from doubt": Gardner v. Allegheny County, 382 Pa. 88, 94 (1955).

## I. THIRD-PARTY BENEFICIARY CLAIM

One of the basic questions as to whether the within action may be maintained is the standing of plaintiff and the class he purports to represent to bring this action. Plaintiff claims he and the class are third-party beneficiaries under the provisions of the lease contracts between the Turnpike Commission and the three oil company defendants which provide that the prices to be charged for gasoline, motor fuels, motor oils and food to be sold from the demised premises should not be in excess of the retail prices prevailing in the vicinity. He likewise contends that they are third-party beneficiaries under the subleases to Howard Johnson.

The invitation pursuant to which bids were allegedly submitted by the three oil company defendants dated December 14, 1949, provides as follows:

"The servicing of patrons of the Pennsylvania Turnpike System with gasolines, oils, station service and food, places upon the Commission the responsibility of guaranteeing that all products sold on the Turnpike shall be of the highest quality, expeditiously and efficiently provided and *sold for no more than similar products and services available off and in proximity to the Turnpike Right-of-Way.*" (Emphasis supplied.)

In addition, General Provisions accompanying the invitation provide:

"6. Price.

"The retail prices of gasoline, other motor fuels and oils sold by the Lessee shall not exceed the prevailing prices in the vicinity."

More specifically, the December 14, 1953, contract between the Turnpike Commission and Atlantic provides:

"10. Lessee covenants and agrees that the prices

at which gasoline, motor fuels, motor oils and food shall be sold from the demised premises shall not be in excess of the retail prices prevailing in the vicinity."

The lease of March 8, 1950, between the Turnpike Commission and Gulf does not specifically mention food:

"10. Lessee covenants and agrees that the prices at which gasoline, motor fuels and motor oils shall be sold from the demised premises shall not be in excess of the retail prices prevailing in the vicinity."

The contract between the Turnpike Commission and Humble has not been supplied to this court. Because defendant Humble has neither objected to this omission nor attempted to produce the contract, although it is in a superior position to do so, the allegation in the complaint that said contract requires Humble to charge prices for gasoline, motor fuels, motor oils and food not exceeding the retail prices prevailing in the vicinity, will be accepted as true for the purpose of the motion. Moreover, the language in the Invitation to Bid alone is deemed sufficient to establish Humble's responsibility for purposes of deciding preliminary objections.

Plaintiff contends that he is a third-party beneficiary of the above-cited provisions and, therefore, has a cause of action against the oil companies for any breach of those provisions. The oil company defendants would also be liable to plaintiff for any breach by their subtenants. A lessee is responsible for any violation of the covenants of his lease by a subtenant, irrespective of whether he knew of such violation or not: Burke v. Bryant, 283 Pa. 114, 121 (1925); Goenner v. Glumicich, 81 Pa. Superior Ct. 521 (1923).

In regard to the liability of Howard Johnson, it is

alleged that its subleases with the three oil companies are subject to the terms of the original leases between the oil company defendants and the Turnpike Commission, and likewise obligate Howard Johnson as sublessee to adhere to the same requirements imposed on the oil companies with respect to sales of food and other products and services.

The contract of November 23, 1965 between Howard Johnson and Humble contains the following clause:

"11. It is understood and agreed that Lessor is not the owner of the demised premises and that the within Lease and the estate created thereby are subject to all of the terms, provisions and conditions of the leases under which Lessor holds the demised premises from the Pennsylvania Turnpike Commission . . ."

A similar clause is contained in the contract of March 17, 1965, between Gulf and Howard Johnson; while the January 17, 1957, contract between Atlantic and Howard Johnson provides:

"Nothing herein contained which is necessarily inconsistent with Lessor's rights and duties under the terms of its lease from the Pennsylvania Turnpike Commission shall operate to bind the parties hereto."

More specifically, the March 17, 1965, contract between Gulf and Howard Johnson provides:

"4.(g) Sublessee covenants and agrees that the prices charged by it for food, merchandise and services sold or rendered shall be in keeping with prices charged for comparable food, merchandise and service on the Pennsylvania Turnpike System and in competitive areas."

Likewise, the November 23, 1965, contract between Humble and Howard Johnson contains the following provision:

"13. Lessee agrees that the price at which food shall be sold from the premises shall not be in excess of the retail prices prevailing in the vicinity."

There is no similar specific price provision in the contract between Atlantic and Howard Johnson. However, it is settled law that a sublessee contracts with notice of all terms and conditions of the original lease and is bound thereby: Sinberg v. Davis, 285 Pa. 426 (1926). Therefore, Howard Johnson would be bound by paragraph 10 of the contract of December 14, 1953, between the Turnpike Commission and Atlantic, as well as all other provisions of the contracts between the oil company defendants and the Turnpike Commission.

The above-quoted provisions, plus the allegations of the complaint, which, for the purpose of deciding preliminary objections must be accepted as true, sufficiently set forth that all four defendants are obligated by contract to charge prices for goods and services which do not exceed the prices charged in the vicinity of their turnpike establishments for similar goods and services.

Plaintiff complains that as a purchaser of products and services of defendants, he and the class which he purports to represent are the ones who were intended to be benefitted by the contract provisions and, accordingly, they are third-party beneficiaries entitled to recover the alleged over-charges and to enjoin such over-charges in the future.

The principle of third-party beneficiaries is recognized by the law of Pennsylvania. As stated in the leading case of Spires v. Hanover Fire Insurance Co., 364 Pa. 52, 56-7 (1950):

"To be a third party beneficiary entitled to recover on a contract it is not enough that it be intended by *one* of the parties to the contract and the *third person*

that the latter should be a beneficiary, but *both parties to the contract* must so intend that must indicate that intention in the contract; in other words, a promisor cannot be held liable to an alleged beneficiary of a contract unless the latter was within his contemplation at the time the contract was entered into and such liability was intentionally assumed by him in his undertaking; the obligation to the third party must be created, and must affirmatively appear, in the contract itself." (Emphasis in original.)

In Restatement, Contracts, §145, the rule with respect to beneficiaries under contracts with a governmental agency, states, in pertinent part:

§145. Beneficiaries under promises to the United States, a state, or a municipality.

"A promisor bound to the United States or to a State or municipality by contract to do an act or render a service to some or all of the members of the public, is subject to no duty under the contract to such members to give compensation for the injurious consequences of performing or attempting to perform it, or of failing to do so, unless,

"(a) *an intention is manifested in the contract, as interpreted in the light of the circumstances surrounding its formation,* that the promisor shall compensate members of the public for such injurious consequences, or

"(b) the promisor's contract is with a municipality to render services the non-performance of which would subject the municipality to a duty to pay damages to those injured thereby." (Emphasis supplied)

While there is no direct language in the above-cited contract provisions which specifies that there is an intent on the part of the parties to benefit the public by the pricing provisions and afford them a

right of action for their breach, the court deems it necessary to consider the provisions in relation to the total context of turnpike operations.

If the thrust of a contract between a governmental agency and a private party is for the benefit of individual members of the public, then a third-party benefit is created which can be enforced by a member of the public in the event of a breach by the private contractor.

Thus, it has been held that an employe who signed the President's Reemployment Agreement under the National Industrial Recovery Act and thereupon received and displayed the "Blue Eagle" emblem at his place of business was liable to an employe for the difference between the minimum wage prescribed in the agreement and the wage actually paid. Hence, the employe could maintain an action against his employer as a third-party beneficiary: Greleck v. Amsterdam, 20 D. & C. 351 (M.C., Phila. Co., 1934).[2]

A case almost directly in point is that of Adams v. Union Railroad Company, 21 R. I. 134, 42 Atl. 515 (1899). In that case, the town of East Providence, Rhode Island, granted a franchise to a street railroad company. The contract stipulated that the fare between any two points on its line should not exceed five cents. Thereafter, a passenger boarded the car,

---

[2] See also 4 Corbin on Contracts, Municipal Contracts, §805, at 204, and cases there cited for the proposition that where there is a provision in a public contract establishing a minimum wage for workmen, a worker can maintain suit on the contract against an employer who has failed to pay a minimum wage.

Cf. Kowalski v. Shopping Cart, Inc., 56 D. & C. 2d 571 (C. P., Phila. Co., 1972), where it was ruled that adjoining property owners who have been or would be damaged by a construction in violation of a zoning ordinance would have such a substantial interest in the enforcement of a zoning restriction as to make them proper parties in a suit to compel their observance and to obtain injunctive relief in equity.

tendered a fare of five cents, refused to pay more and was ejected. He then brought an action against the railroad company in trespass for assault and battery. In sustaining plaintiff's right to maintain the action, the Supreme Court of Rhode Island declared:

"The contract in question was made for the benefit of passengers using the defendant's cars. The town can hardly show damages for its breach, and therefore, if the people for whose benefit it was made cannot recover for its breach, no one can. True, the town might take steps to avoid the contract and stop the road, for failure to perform conditions, but in so doing it would cut off the privileges of many to redress the wrong of one. This would neither be a reasonable nor an adequate remedy. It must have been intended to be a contract for the benefit of the public, made through the town as their corporate representative, upon which passengers could rely, and for breach of which they could seek redress. Otherwise it is a contract of little obligation and force": Id. at 137-38, 42 Atl. at 516.

In Independent School District of Le Mars v. Le Mars City, Water & Light Co., 131 Iowa 14, 107 N. W. 944 (1906), the City of Le Mars, Iowa, by ordinance, which was deemed to constitute a contract when accepted, granted defendant utility company the exclusive right to maintain a system of waterworks in the city. The contract set forth a schedule of maximum rates and provided for free service to churches and schools. In reversing a lower court's dismissal of plaintiff school district's action of mandamus to compel defendant water company to provide it with free water, the Supreme Court of Iowa said:

"It is further contended that there is no privity of contract between the parties and therefore that the plaintiff has no right to maintain this action. If this be true, it is plain that no inhabitant of the city may main-

tain an action to compel a private water company to comply with its contract with the city to furnish the inhabitants thereof water for domestic purposes, and we do not think that such a rule can possibly obtain. The statute granting the City power to authorize private persons or corporations to construct waterworks and giving the city the power to fix the rates by contract, *impliedly, at least, makes every consumer of water thereunder privy to the contract to such an extent as to enable him to enforce his rights under the contract"*: Id. at 19, 107 N. W. at 946 (Emphasis supplied.)

See also Washington Water & Electric Co. v. Pope Manufacturing Co., 176 Ga. 155, 167 S. E. 286 (1932) (action by two residents of a municipal corporation to enjoin defendant utility from executing threat to cut off water because plaintiff refused to pay charges in excess of those prescribed by contract between the utility and municipality); People- ex rel. Jackson v. Suburban Railroad Co., 178 Ill. 594, 53 N. E. 349 (1899) (mandamus by citizen to enforce railway rates set forth in ordinance granting railroad company the right to use streets of municipality of River Forest, Ill.); Westfield Gas & Milling Co. v. Mendenhall, 142 Ind. 538, 41 N. E. 1033 (1895) (inhabitants of Westfield, Ind., had standing to enjoin gas company from charging more than rates specified in town ordinance which was accepted by the company); Charles Simons Sons Co. v. Maryland Telephone & Telegraph Co., 99 Md. 141, 57 Atl. 193 (1904) (Baltimore residents permitted to enforce telephone rates specified in ordinance granting defendant the right to use city streets to carry on telephone business); Rice v. Detroit, Ypsilanti & Ann Arbor Railway, 122 Mich. 677, 81 N. W. 927 (1900) (action in assumpsit by passenger to recover fares paid in excess of ticket rate prescribed in

railroad's franchise granted by the village of Dearborn, Mich.); and Farnsworth v. Boro Oil & Gas Co., 216 N. Y. 40, 109 N. E. 860 (Ct. App., 1915) (suit by residents to restrain gas company from charging more than 25 cents per thousand cubic feet of gas as required by a permit issued by the commissioners of the town of Collins, N. Y., to defendant company).

A more recent case is Daar v. Yellow Cab Co., 67 Cal. 2d 695, 63 Cal. Rptr. 724, 433 P. 2d 732 (1967). Under a franchise granted to defendant, Yellow Cab Company, by the Public Utilities Commission of the City of Los Angeles, defendant was to charge only those taxi rates fixed by the commission. Plaintiff alleged that defendant increased those rates without permission of the commission. The Supreme Court of California held that plaintiff had standing to maintain an action against the cab company on his own behalf and on behalf of all others similarly situated to recover the overcharges.

The above cited cases emanating from nine sister states clearly stand for the proposition that minimum price provisions in contracts between a public authority and a private corporation are intended for the benefit of the public and can be enforced by members thereof. Some of the cases have gone even further and said that only the public can enforce such provisions because it is the real party in interest, the governmental contractor having no stake in the matter so as to afford it rights of enforcement. See, e.g., Independent School District of Le Mars v. Le Mars City, Water & Light Co., 131 Iowa at 19, 107 N. W. at 946 (1906); and Adams v. Union Railroad Co., 21 R. I. at 137, 42 Atl. at 516 (1899).

The Pennsylvania case of Commonwealth ex rel. Stern v. Wilkes-Barre Gas Co., 2 Kulp 499, 12 Luz. 385 (C. P., Luz. Co., 1883), recognized this right of enforce-

ment. It was a proceeding in mandamus to compel defendant to supply gas to the relator for lighting purposes. In overruling a motion to quash, the court said:

"The grant by the Legislature to a private corporation of the exclusive privilege to supply the inhabitants of a particular town or city with an article in such common use as illuminating gas would imply a duty also, and a corresponding right in the citizen, upon compliance with all reasonable regulations and upon proper conditions, to have his dwelling connected with its mains, which right he could enforce, even though the grant were unaccompanied by mandatory words": Id. at 502, 12 Luz. at 388.

Clearly, the food and automotive goods and services sold along the Pennsylvania Turnpike are today as essential to the public as the utility services involved in the above-cited cases. Although those cases deal with contracts between private corporations and municipalities, the rationale for the decisions is equally applicable to contracts with the State, or, as in this case, with a quasi-governmental agency. That the Turnpike Commission is intended to serve a public purpose is set forth in section 4 of the Act of May 21, 1937, P. L. 774, 36 P. S. §652d (1961):

"The [Pennsylvania Turnpike] commission is hereby constituted an instrumentality of the Commonwealth, and the exercise by the commission of the powers conferred by this act in the construction, operation and maintenance of the turnpike shall be deemed and held to be an essential governmental function of the Commonwealth."

See also Commonwealth v. Merritt-Chapman & Scott Corp., 432 Pa. 584 (1968); and Rader v. Pennsylvania Turnpike Commission, 407 Pa. 609 (1962).

The court takes judicial notice of the fact that the Pennsylvania Turnpike is a limited access highway

and that through travelers thereon who wish to avail themselves of the facilities furnished by defendants have no choice except to pay the prices demanded unless they wish to undergo the inconvenience of leaving the turnpike at an interchange and thereafter reentering the turnpike. The conclusion is inescapable that the purpose of the price provision in the contracts was not to benefit the Turnpike Commission, but was intended for the protection of the users of the turnpike against price gouging by reason of the almost monopolistic position of defendants. Since the provision was obviously made for their benefit, those whom it was intended to benefit should have a right to seek redress for failure to receive that benefit. Otherwise, as set forth in Adams v. Union Railroad, supra, "it is a contract of little obligation and force."

## II. CLASS ACTION

The second major preliminary objection is that even though plaintiff and the class whom he purports to represent may have stated a cause of action as third-party beneficiaries, nevertheless, relief may not be granted by the device of a class action, but rather that the parties should have their remedy individually by an action at law in assumpsit.

Class actions, as such, are not new to Pennsylvania jurisprudence, although in the past they were primarily related to taxpayer's action to compel or enjoin municipal conduct. See, e.g., Price v. Philadelphia Parking Authority, 422 Pa. 317 (1966). Another example is the stockholders' derivative suit to enforce rights of the corporation against a third party when the corporation refuses to bring the action: Shapiro v. Magaziner, 418 Pa. 278 (1965). See also Penn Galvanizing Co. v. Philadelphia, 388 Pa. 370 (1957); Gericke v. Philadelphia, 353 Pa. 60 (1945); Schlanger

v. West Berwick Borough, 261 Pa. 605 (1918), and other examples noted in 3 Goodrich-Amram Civil Practice, §2230(a)-3, at 11-18.

Pennsylvania Rule of Civil Procedure 2230 provides specifically for class actions in the following language, in pertinent part:

"Rule 2230. Class Actions.

"(a) If persons constituting a class are so numerous as to make it impracticable to join all as parties, any one or more of them who will adequately represent the interest of all may sue or be sued on behalf of all, but the judgment entered in such action shall not impose personal liability upon anyone not a party thereto."

The note to that section provides, in pertinent part:

"Note: This subdivision adopts the practice under Pennsylvania equity rule 16 and F. R. C. P. No. 23(a) [28 U.S.C.A.], in providing for a class suit where the members of a class are so numerous as to make it impractical to join all as parties."

Hence, for guidance in determining the propriety of the class action, we proceed to examine the decisions under Federal Rule of Civil Procedure 23(a). That rule provides, in pertinent part:

"(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."[3]

---

[3] The full text of Rule 23 is set forth in the Appendix to this opinion.

We will consider the foregoing elements individually.

## A. *Impracticability of Individual Joinder*

The complaint states that the class consists of plaintiff and "all other users of the Pennsylvania Turnpike who have purchased gasoline, motor fuels, motor oils and food from any or all of the Defendants at prices in excess of the retail prices prevailing in the vicinity."

The court may take judicial notice that great numbers of motor vehicles use the Pennsylvania Turnpike each year. In fact, one of the preliminary objections is that the number of plaintiffs would be so great that it would be a practical impossibility to manage this litigation as a class action. Although the exact number would be a matter of proof as would the number of those who have purchased the items mentioned above, it would appear clear that the number in that class are so numerous that joinder of all the members is impracticable.

## B. *Representation of the Class*

Although this question was not specifically raised by the preliminary objections, it is an important element to a class action that the person bringing the suit fairly and adequately represent the class. This issue was dealt with in Dolgow v. Anderson, 43 F. R. D. 472, 496 (E.D.N.Y., 1968), where the court interpreted Rule 23:

"Defendants point out that plaintiffs' counsel graduated from law school only seven years ago and is handling the case by himself. They suggest that he was only retained by these plaintiffs because he is closely related to them.

"This argument is untenable. Plaintiffs' counsel is admitted to practice in both state and federal courts.

Until the contrary is demonstrated, courts will assume that members of the bar are skilled in their profession. " . . .

"Moreover, . . . [s]ubdivision (d) (2) of Rule 23 gives the courts express authority to give those not before the court 'the opportunity . . . to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action.' In addition, under subdivision (d) (3) the court may impose 'conditions on the representative parties.' It has a broad range of discretion to assure adequacy of representation according to the individual circumstances of every case."

In view of the above, and the capability that plaintiff's counsel has displayed thus far in the proceedings, and in the absence of countervailing information, the court must necessarily conclude that the plaintiff and his counsel will fairly and adequately represent the class.

## C. *Common Questions of Law and Fact*

Defendants contend that the individual claims of the members of the proposed class of plaintiffs will vary to such an extent that they may not be joined in a single action. Federal Rule 23(a) states that one or more members of the class may sue as representative parties in a class action if (1) there are questions of law or fact common to the class;[4] and (2) claims or defenses of the representative parties are typical of the claims or defenses of the class.[5]

With respect to the claims of plaintiff and the class which he purports to represent, the basis of the complaint is that defendants have overcharged all mem-

---

[4] F. R. C. P. 23(a)(2)

[5] F. R. C. P. 23(a)(3)

bers of the class by reason of their failure to charge prices which were comparable with those prevailing in the vicinity of the various facilities operated by defendants.

The cause of action is based upon third-party beneficiary rights afforded turnpike users by virtue of the aforementioned contract provision. Since the rights of every member of the class, including plaintiff Lieberman, stem from the same source, it is clear that there are common questions of law in regards to the claims of the class members.

It appears equally true that there exist common questions of fact which predominate over any questions affecting individual members, and the claims or defenses of plaintiff Lieberman are typical of the claims or defenses of the class.

While it is undoubtedly true that many different products and services were sold by defendants at their facilities, the essential claim is overcharges for these items. Ostensibly, the defense would be that there were no such overcharges. The mere fact that the claims of the various members of the purported class would vary in amount and as to the particular items involved need not in and of itself defeat a class action. See Eisen v. Carlisle & Jacquelin, 391 F. 2d 555 (2nd Cir., 1968). Also see State of West Virginia v. Chas. Pfizer & Co., Inc., 314 F. Supp. 710 (S.D.N.Y., 1970).

Logically, the method of proof would be to identify the products sold and services rendered by defendants and compare the costs thereof with the prices charged in off-turnpike facilities in the respective areas for the same products and services.

It is, of course, possible that the number and variety of products and services involved would be so great and problems of proof so enormous as to pre-

sent the court with an insuperable problem in determining this issue.

Basically, however, the difficulty to be anticipated in proving that there were overcharges in the context of a class action, may be no greater than in an action involving joinder of several plaintiffs, or consolidation of several individual actions.

## D. *Manageability*

Although the note to Pa. R. C. P. 2230 does not refer specifically to F. R. C. P. 23(b), Rule 23(b) (3) is of such importance that it must be considered. It states that in determining whether an action may be maintained as a class action, the court should look into "the difficulties likely to be encountered in the management of a class action." In this case, such difficulties may include: (1) Identification of class members; (2) notification to class members of the pendency of the action, in view of the fact that users of the turnpike may reside in all 50 of the United States and in foreign countries, including Canada and Mexico; (3) the handling of inquiries and communications with members of the class; (4) proof of individual damages; (5) problems of distribution of damages to individual members of the class, in the event that a recovery is decreed. Many other difficulties may well be anticipated.[6]

All of the foregoing factors have received consideration in the Federal courts and the conclusions have not been uniform.

---

[6] See, Arthur R. Miller, Problems in Administering Judicial Relief in Class Actions Under Federal Rule 23(b)(3), 54 F. R. D. 501; Comment, Management Problems of the Class Action Under Rule 23(b)(3), 6 U. San. Fran. L. Rev. 343 (1972); Comment, Manageability of Notice and Damage Calculation in Consumer Class Actions, 70 Mich. L. Rev. 338, (1971); Marshall Grossman, Manageability and the Fluid Recovery Doctrine, 47 L.A. Bar Asso. Bull. 415 (Sept., 1972).

In approaching the problem of manageability, an excellent basic guide is provided by the observations of the United States Court of Appeals for the Tenth Circuit in Esplin v. Hirschi, 402 F. 2d 94, 99 (10th Cir., 1968), where the court observed:

"It cannot be denied that the resolution of the class action issue in suits of this type places an onerous burden on the trial court. But if there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require."

In Dolgow v. Anderson, 43 F. R. D. 472 (E.D.N.Y., 1968) a class action by four stockholders against a corporation, its officers and directors for allegedly misleading investors by manipulating stock prices, the court declared:

"Defendants are opposed to permitting the litigation to go forward under Rule 23. In addition to arguing that this action does not meet the requirements of subdivisions (a) and (b) of the Rule, they are appalled at the procedural horrors in the offing. They note the unwieldiness of the classes involved, the likelihood of squabbling among numerous prospective plaintiffs' attorneys, the difficulties inherent in trying the issues affecting each individual member of the class, and the impossibility of plaintiffs with limited resources providing adequate notice and representation to such a large group of people.

"Defendants misconceive the court's role in actions of this sort. The Rule 23 class action 'as a way of redressing group wrongs is a semi-public remedy administered by the lawyer in private practice'—a cross between administrative action and private litigation. . . Once the court is convinced that there is substantial merit to plaintiff's claims and that the class action device is the practicable method of vindicating

these claims, it will not let procedural difficulties stand in its way": Id. at 481.

The issues of identification of class members and the number of such members would not alone appear to be determinative of the question of manageability.

Daar v. Yellow Cab Company, 67 Cal. 2d 695, 63 Cal. Rptr. 724, 433 P. 2d 732 (1967), was a class action brought under California law by an individual on his own behalf and on behalf of all other persons similarly situated against defendant to recover as damages overcharges allegedly made for taxicab services in the City of Los Angeles during a period of four years preceding the action. In overruling the demurrer by the court below, the court declared:

"Defendant apparently fails to distinguish between the necessity of establishing the existence of an ascertainable class and the necessity of identifying the individual members of such class as a prerequisite to a class suit. If the existence of an ascertainable class has been shown, there is no need to identify its individual members in order to bind all members by the judgment. The fact that the class members are unidentifiable at this point will not preclude a complete determination of the issues affecting the class. Presumably an accounting in the suit at bench will determine the total amount of the alleged overcharges; any judgment will be binding on all the users of taxicabs within the prior four years. However, no one may recover his separate damages until he comes forward, identifies himself and proves the amount thereof.

"Thus, whether there is an ascertainable class depends in turn upon the community of interest among the class members in the questions of law and fact involved. If we conclude that the instant complaint properly sets forth a class action, the judgment herein

will be res judicata as to all persons to whom the common questions of law and fact pertain. We therefore proceed to examine the complaint in order to determine whether it sets forth a sufficient community of interest": Id., 67 Cal. 2d at 706.

As has been previously discussed, this court finds that users of the Pennsylvania Turnpike who purchased goods and services from the named defendants constitute an ascertainable class, and that questions of law and fact common to those class members predominate over questions of law and fact affecting only individual members.

Moreover, as was pointed out in Katz v. Carte Blanche Corp., 53 F. R. D. 539 (W.D. Pa., 1971):

"Sheer size of a class is not negatively determinative of the issue of the superiority of a class action. Eisen v. Carlisle & Jacquelin, 391 F. 2d 555 (2d Cir. 1968). The critical determinant is that of its manageability—judicially, administratively and practically—as a class action": Id, at 541.

There, it was ruled that an action by a credit card holder on his own behalf and on behalf of other persons similarly situated, alleging violation of the Truth in Lending Act by the user of credit cards with respect to disclosure of finance charges, would be maintained as a class action on behalf of some 600,000 members. The grant of class action status was upheld by the Court of Appeals for the Third Circuit, even though by the time the appeal was argued the potential class had risen to 800,000 members: Katz v. Carte Blanche Corp., Civil No. 72-1054 (3d Cir., filed May 22, 1973).

In Zachary v. Chase Manhatten Bank, 52 F. R. D. 532 (S.D. N.Y., 1971) the United States District Court for the Southern District of New York held that an action by a credit card holder challenging unlawful finance charges imposed on holders of Uni-Card could

be maintained as a class action on behalf of one million holders plus an undetermined number of former holders whose accounts had been either purged or cancelled.

The so-called "Drug Cases" are prime examples of judicial recognition of huge classes under Rule 23. During the 1960's approximately 150 actions were begun in various United States district courts alleging that five drug companies had violated anti-trust laws in the sale of broad spectrum antibiotic drugs.

Plaintiffs in these cases included drug wholesalers, retailers, individual consumers and every State in the United States (with the exception of Nevada), the District of Columbia, Puerto Rico and numerous cities and counties, including New York City, Chicago, Los Angeles, Philadelphia and Baltimore. The thrust of the States' claims was as parens patriae on behalf of their citizens, or on behalf of classes including the State as a consumer and all other consumers in the State. Obviously, the potential class membership was in the hundreds of millions.

Sixty-six civil class actions were consolidated for purposes of settlement in West Virginia v. Chas. Pfizer & Co., Inc., 314 F. Supp. 710 (S.D.N.Y., 1970), affirmed 440 F. 2d 1079 (2d Cir., 1971). The class members included consumers in all States except seven.

In In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions, 333 F. Supp. 278 (S.D.N.Y., 1971), it was held that those seven States which had opted out of the settlement (California, Hawaii, Kansas, Oregon, North Carolina, Utah and Washington) were entitled to maintain class actions on behalf of consumers within each State who purchased or paid for broad spectrum antibiotic products at the retail level for human consumption from 1956 through 1966, as well as on their behalf for welfare purchases

and outlays. The potential class there was also in the millions.

See also In re Ampicillin Antitrust Litigation, 55 F. R. D. 269 (D.D.C., 1972)

However, the Federal courts have been far from unanimous in allowing a class action where the potential class members number in the millions.

In Reinisch v. New York Stock Exchange, 52 F. R. D. 561 (S.D. N. Y., 1971), a class action was brought by an individual against stock exchanges and broker-age firms alleging anti-trust violations in agreed-on commission rates and surcharges for buying and sell-ing securities. In refusing to permit the action to proceed as a class action, the court pointed out that the potential class consisted of 20,000,000 members, including about a million members outside the United States and that the claims of the moving plaintiff based on his own transactions were unlike those of the class for which he wished to act.

Also, see Hackett v. General Host Corp., Civil No. 70-364 (E.D. Pa., 1970), unreported, which was a class action by a consumer of bread purchased at retail on her own behalf and on behalf of some 6,000,000 consumers in the Philadelphia market area against seven bakeries of pan baked bread seeking treble damages, costs and attorneys fees for alleged viola-tion of the Sherman Act. The District Court ruled that the problem of management of the proposed class was insurmountable and ruled that the action could not continue as a class action. Upon appeal, that ruling was held to be an unappealable interlocutory order: 455 F. 2d 618 (3rd Cir., 1972), cert. denied 407 U.S. 925, 32 L. Ed. 2d 812 (1972).

Reference is also made to the case of Hawaii v. Standard Oil Company, Civil No. 2826 (D. Hawaii, 1969) unreported, affirmed 405 U. S. 251, 31 L. Ed.

2d 184 (1972), where plaintiff sought to maintain a class action on behalf of every individual purchaser of gasoline in the State. There, the court found the action to be unmanageable. Likewise in United Egg Producers v. Bauer International Corp., 312 F. Supp. 319 (S.D.N.Y., 1970), it was ruled that a class comprising all consumers of eggs in the United States was so large that it would be next to impossible to identify members of the class and give them appropriate notice, and that the management problems for the court would be virtually insuperable.

In Eisen v. Carlisle & Jacquelin, Civil No. 72-1521 (2d Cir., filed May 1, 1973), a class action on behalf of approximately 6,000,000 odd lot stock investors, alleging major odd lot dealers on the New York Stock Exchange had conspired to monopolize trading and charge excess fees, was dismissed as unmanageable.[7]

Another case holding a proposed class action unmanageable is City of Philadelphia v. American Oil Company, 53 F. R. D. 45 (D.N.J., 1971). That was a price fixing anti-trust action against gasoline com-

---

[7] Eisen has had a long history in the courts. The class action was commenced in 1966 and initially dismissed as unmanageable: 41 F. R. D. 147 (S.D.N.Y., 1966). In 370 F. 2d 119 (2d Cir., 1966), cert. den. 386 U. S. 1035, 18 L. Ed. 2d 598 (1967), it was held that the order dismissing the class action was appealable. In 391 F. 2d 555 (2d Cir., 1968), the court of appeals held that the dismissal of the class action was too summary and lacked an evidentiary basis. Upon remand, the district court held that the action was maintainable: 52 F. R. D. 253 (S.D.N.Y., 1971) and that defendants were to initially bear 90 percent of the cost of notice: 54 F. R. D. 565 (S.D.N.Y., 1972). The decisions on remand were reversed in Eisen v. Carlisle and Jacquelin, Civil No. 72-1521 (2d Cir., filed May 1, 1973). Plaintiff's petition for a rehearing en banc was denied May 24, 1973. The time period within which a petition for writ of certiorari to the United States Supreme Court may be filed has not yet expired.

panies brought as a class action by a major taxi company, a contractor, the City of Philadelphia and the State of New Jersey. The court held that the actions could be maintained by the taxi company on behalf of 550 similar companies in the tri-state area of Pennsylvania, New Jersey and Delaware; by the contractor on behalf of approximately 10,000 bulk purchasers in the area; and by the City of Philadelphia and the State of New Jersey on behalf of governmental units and bulk purchasers in the three States; but not on behalf of a potential class of 6,000,000 retail consumers in the three States.

The district court cited several factors in support of its conclusion that the problems of manageability were so great that a class action could not be considered to be superior to other available methods to resolve the controversy:

(1) The difficulty of affording notice to the class members in a way consistent with due process;

(2) The failure to show that, if liability were proven, each class member would receive a relatively large recovery with minimal costs;

(3) The difficulty in assessing damages;

(4) The difficulty foreseen in distributing any recovery to the class members.

The first factor is applicable here. Because class action litigation determines the rights of absent class members, a way must be found to afford class members notice of this litigation or it cannot be maintained as a class action.

In view of the very wide dispersion of the class, the notice required to meet requirements of due process should be such as to make it likely that the greatest possible number of members of the class should be made aware of the pendency of the litigation: Berland v. Mack, 48 F. R. D. 121, 129 (S.D.N.Y., 1969).

The United States Supreme Court in Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 94 L.Ed. 865 (1950) set forth the parameters of the notice requirement:

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections . . . The notice must be of such nature as reasonably to convey the required information, . . . and it must afford a reasonable time for those interested to make their appearance . . . [W]hen notice is a person's due, process which is a mere gesture is not due process": Id. at 314-15, 94 L. Ed. at 873-74.

Mullane dealt with the constitutional sufficiency of notice to beneficiaries of judicial settlements of accounts by the trustee of a common trust fund established under the New York Banking Law. The court held acceptable notice by publication to those beneficiaries whose interests or whereabouts could not, with due diligence, be ascertained, but required personal notice to all beneficiaries of known place of residence.

The notice requirement set forth in F. R. C. P. 23-(c)(2) is consistent with Mullane and provides:

"In any class action maintained under subdivision (b)(3), *the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.* The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request

exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel."[8] (Emphasis supplied.)

Rule 23(c)(2) has not, however, been subject to uniform interpretations. In Nolop v. Volpe, 333 F. Supp. 1364 (D.S.D., 1971), a president of the student body of a university who brought a class action on behalf of the students to enjoin construction of a highway through the campus was permitted to give notice by conspicuous ads in the official student body newspaper and by broadcasting the notice over the university radio and television stations.

In Booth v. General Dynamics Corp., 264 F. Supp. 465 (N.D. Ill. 1967), a taxpayer's action under Rule 23(b)(3) alleging the defendant corporation had received valuable leases of sanitary district land at

---

[8] It should be noted that when a class action is based on a subsection of Rule 23 other than (b)(3), as when injunctive relief only is sought, notice is governed by Rule 23(d)(2) and is a matter of more discretion. Thus, in Rule 23(b)(1) and (2) actions alleging racial discrimination or other civil rights violations, the notice issue is rarely even acknowledged. See, i.e., Nicholls v. Schaffer, 344 F. Supp. 238 (D. Conn., 1972); Ferguson v. Williams, 330 F. Supp. 1012 (N.D. Miss., 1971); Goodwin v. Wyman, 330 F. Supp. 1038 (S.D.N.Y., 1971), affirmed 406 U. S. 964, 32 L. Ed. 2d 664 (1972). But see Clark v. American Marine Corp., 297 F. Supp. 1305 (E.D. La., 1969); Johnson v. Robinson, 296 F. Supp. 1165 (N.D. Ill., 1967).

However, in deferrment cases which arose under selective service laws, decisions favorable to the claimants were held to be not res judicata as to absent class members because no notice to them was ever given: Schrader v. Selective Service Sys. Local Bd. No. 76 of Wisconsin, 470 F. 2d 73 (7th Cir., 1972), cert. den. 409 U. S. 1085, 34 L. Ed. 2d 672 (1972); Zeilstra v. Tarr, 466 F. 2d 111, 113 (6th Cir., 1972), reversing the notification aspect of Gregory v. Hershey, 51 F. R. D. 188 (E.D. Mich., 1970); Sandler v. Tarr, 463 F. 2d 1096 (4th Cir., 1972); Pasquier v. Tarr, 444 F. 2d 116 (5th Cir., 1971), aff'g 318 F. Supp. 1350 (E.D. La., 1970).

grossly inadequate rentals, it was held that the best notice practicable would be by publication. See also Biechele v. Norfolk & Western Railway Co., 309 F. Supp. 354 (N.D. Ohio, 1969).

In West Virginia v. Chas. Pfizer & Co., Inc., 314 F. Supp. 710 (S.D.N.Y., 1970), notice of a proposed settlement in the antibiotic anti-trust action was given to consumer class members by publication in every daily English and Spanish language newspaper of general circulation in every State. However, in Pfizer, Inc. v. Lord, 449 F. 2d 119 (2d Cir., 1971), the court ordered that written notice be mailed to each household in the seven States that opted out of the antibiotic anti-trust settlement. Most recently, in Eisen v. Carlisle & Jacquelin, Civil No. 72-1521 (2d Cir., filed May 1, 1973), rehearing denied May 24, 1973, the court held that if "identification of any number of members of the class can readily be made, individual notice to those members must be given and [the plaintiff] must pay the cost": Id. at 3234. The court further held that "[w]here there are millions of dispersed and unidentifiable members of the class notices by publication giving the essential information required by amended Rule 23 are a farce": Id. at 3239.

In the instant case, it is necessary for plaintiff to indicate the size of the class; how many of these persons can be identified through reasonable efforts; how identified class members are to be notified; how members who are not capable of identification are to be notified; and who is initially to bear the costs of notice.

The second factor cited by the American Oil court, that it must appear likely that each class member will receive a relatively large recovery with minimal costs, is acceptable only in part. To require that the potential recovery per class member be "relatively large"

would virtually defeat the purpose of consumer class action suits. In Eisen v. Carlisle & Jacquelin, 391 F. 2d 555, at 560, the court declared:

"Class actions serve an important function in our judicial system. By establishing a technique whereby the claims of many individuals can be resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and *provides small claimants with a method of obtaining redress for claims which would otherwise be too small to warrant individual litigation.*" (Emphasis Supplied.)

However, it would be an exercise in futility to allow this action to continue if the costs of the suit, including among other things, notice and attorneys' fees, is so great that the class members would not materially benefit: Eisen v. Carlisle & Jacquelin, 391 F. 2d at 567. Also see, Comment, Management Problems of the Class Action Under Rule 23(b)(3), 6 U. of San Fran. L. Rev. 343 (1972). Therefore, it is necessary for plaintiff to show that the anticipated award of total *actual* damages be comparatively large in relation to anticipated costs.

The third and most important factor cited by the court in American Oil was that it would be impossible to compute damages by reference to individual transactions; and if damages were computed on a class basis, many class members who rightfully would be entitled to recover would be unable to do so because of their failure to keep records. Therefore, the court concluded, "no matter how easy it is to establish damages on a class level, if it is extremely difficult or almost impossible to distribute these sums to their rightful recipients, the class is unmanageable": 53 F. R. D. at 72.

In so holding, the court rejected a "fluid class recovery" as a resolution to the problem. In the context of this case, such a recovery would involve a determination of damages at the class level, that is, by

reference to total overcharges, with recoveries to class members who could prove their claims, the remainder to be distributed to or for the benefit of the class as a whole.

It has been argued that this type of approach has two procedural advantages: (1) It postpones until a determination on the merits the question of damages, and (2) it simplifies the method of determining the amount which defendants have allegedly illegally collected, leaving as the last step the determination of the distribution of the refunds to those legally entitled thereto. This approach has been used in a number of cases:

(1) West Virginia v. Chas. Pfizer Co., Inc., 314 F. Supp. 710 (S.D.N.Y., 1970)

(2) In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions, 333 F. Supp. 278 (S.D. N.Y., 1971) (also known as Antibiotic Antitrust Actions)

(3) Market Street Railway Co. v. Railroad Commission, 28 Cal. 2d 363, 171 P. 2d 875 (1946)

(4) Daar v. Yellow Cab Co., 67 Cal. 2d 695, 63 Cal. Rptr. 724, 433 P. 2d 732 (1967)

(5) Bebchick v. Public Utilities Commission, 318 F. 2d 187 (D.C. Cir., 1963)

In West Virginia v. Chas. Pfizer Co., Inc., supra, $100,000,000 was offered by the drug companies in settlement of the antitrust actions against them. This was reduced later by about $18,000,000 to reflect those government entity plaintiffs who rejected the settlement. Notice to the consumer class members of the proposed settlement was made by publication on July 1, 1969. They were given until August 1, 1969, to exclude themselves from the class; and until August 16, 1969, to file a claim. The notice to consumers also contained the following statement:

"If you do not make an individual claim by August 16, 1969, that will constitute an authorization to the Attorney General . . . to utilize whatever money he

may recover as your representative for the benefit of the citizens of your State in such manner as the Court may direct": 314 F. Supp. at 725.

In response to the notice, 38,000 consumers filed claims totaling approximately $16,500,000. However, the settlement finally allotted to the various States for the benefit of consumers was in excess of $31,600-000. Therefore, over $15,000,000 was not to be distributed directly to individual consumers, but rather was to be used by the States for their benefit.

In the Antibiotic Antitrust Actions, supra, procedure whereby a written notice was mailed to each household in the seven States which had opted out of the settlement in West Virginia v. Chas. Pfizer & Co., was approved, but it was further held that it would not be required that each consumer submit an individual claim prior to trial: Pfizer, Inc. v. Lord, 449 F. 2d 119 (2d Cir., 1971).

In Market Street Railway Co. v. Railroad Commission, supra, the Railroad Commission of California had ordered the Market Street Railway Company in San Francisco to reduce its fares from seven to six cents. The California Supreme Court issued a stay order pending final determination of the company's appeal. The order required the company to keep a record of the amount received in excess of the reduced fare rate. If the final determination of the rate proceedings was adverse to the company, then it would be required to make refunds to riders. In the event all the refund money was not claimed, any remainder would go to the State.

The commission's order was affirmed, and the company refunded to claimants $12,014.45 of $705,794.96 in overcharges. During the pendency of the appeal, the City of San Francisco had purchased the company's business and properties. Thereafter, a dispute arose among the (former) Market Street Railroad Company, the City of San Francisco and the State of California over who was entitled to the un-

refunded excess fares. In finding in favor of the city, the court said:

"In equity and good conscience it would seem that the fund should be made available for the benefit of those who were compelled to submit to this unlawful exaction even though most of them deemed it unnecessary or inconvenient to pursue the refunds, small individually, but very substantial in the aggregate. The individual refunds averaged about $2.00, and were made only on written application of the claimant under oath at the office of the company. Equitable considerations dictate that the people of the city, who contributed the moneys and who now own and operate the properties which furnished the service when the excess fares were paid, are entitled to have them distributed for their benefit in the rehabilitation of the physical properties which were acquired during the pendency of the review proceeding, and for the improvement of the service afforded thereby. The distribution of the fund in that manner and its application to the purpose specified will inure to the benefit of those whose payments accumulated the fund, including both the people of the city and outsiders who have occasion to avail themselves of the service": 28 Cal. 2d at 372-73.

But see Illinois Bell Telephone Co. v. Slattery, 102 F. 2d 58 (7th Cir., 1939), cert. denied, 307 U. S. 648, 83 L. Ed. 1527 (1939).

In Daar v. Yellow Cab Co., supra., involving overcharges by the Yellow Cab Company, it was alleged in the complaint that the exact amount of the overcharges was known to defendant. It was held that no appearance by the individual members of the class would be required in order to recover the full amount of the overcharges. Daar was ultimately settled for $1,200,000. As a means of distributing damages to Yellow Cab riders, the court approved settlement provided for a prospective rate decrease in Yellow Cab fares: Marshall Grossman, Class Actions: Managea-

bility and The Fluid Recovery Doctrine, 47 L. A. B. Bull. 415, 420 (Sept., 1972).

In Bebchick v. Public Utilities Commission, supra, it was determined that a fare increase by D. C. Transit System, Inc. was unlawful. The Court of Appeals ordered that the previous fare be reinstated. Finding that it would not be feasible to require that refunds be made to individuals who paid the increase, the court directed that a special fund be established and that "the amount realized by Transit from the increase must be utilized for the benefit of the class who paid it, that is, those who use Transit": 318 F. 2d at 203.

See also Illinois v. Harper & Row Publishers, Inc., 301 F. Supp. 484, 491 (N.D. Ill, 1969).

A recent case expressing a contrary position is Eisen v. Carlisle & Jacquelin, Civil No. 72-1521 (2d Cir., issued May 1, 1973), rehearing denied May 24, 1973, where the Court of Appeals for the Second Circuit held that a "fluid class recovery" is not contemplated by Rule 23 and that it would constitute "an unconstitutional violation of the requirement of due process of law": Id. at 3241.

Despite the unequivocal language of the latest Eisen decision, at this preliminary stage in the proceedings, this court does not wish to rule out all consideration of a fluid class recovery, especially when the alternative would be to permit an alleged wrongdoer to retain the fruits of its alleged misdeeds.

Essential to the maintainability of the class action on this basis is the accuracy with which total damages can be proved. A recovery on a class basis is a proper remedy only if there exists sufficient data from which the court can make a just and reasonable estimate of the damage.

Therefore, it is necessary that plaintiff indicate how he intends to prove damages, and the anticipated accuracy of any computation. In addition, plaintiff

must indicate what proportion of the damages will be capable of direct distribution to class members, and how any residue is to be dealt with.

### III. PARTICULARITY OF AVERMENTS

Another major preliminary objection of defendants is that plaintiff has failed to aver specific transactions in his complaint.

Pennsylvania Rule of Civil Procedure 1019 provides:

"Contents of Pleadings. General and Specific Averments.

"(a) The material facts on which a cause of action or defense is based shall be stated in a concise and summary form.

"(f) Averments of time, place and items of special damage shall be specifically stated."

The complaint alleges a course of dealing over a period of six years involving potentially millions of transactions. In view of these factors, as well as this court's determination that a fluid class recovery may be possible, it would serve no useful purpose, at least at this stage, to deal with individual small transactions in terms of time, place, and special damages.

Moreover, it is clear from the complaint that plaintiff is alleging a general practice of overcharging by defendants at *all* their turnpike establishments. Because the locations of their respective turnpike establishments are certainly within the knowledge of the four defendants, it is unnecessary for plaintiffs to set forth each of the locations.

### IV. IMPROPER JOINDER OF DEFENDANTS

Another pertinent contention made by the various defendants is that they have been improperly joined under Pa. R. C. P. 2229(b), which provides:

"A plaintiff may join as defendants persons against whom he asserts any right to relief jointly, severally, separately or in the alternative, in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences if any common question of law or fact affecting the liabilities of all such persons will arise in the action."

Defendants assert that any right to relief that plaintiffs may have does not arise out of the same transaction or occurrence, or from a series of transactions or occurrences. This assertion is posited on the fact that the contracts between the oil companies and the Turnpike Commission are separate and distinct; and that the contracts between Howard Johnson and the oil companies are equally unrelated.

It may well be that severance of the cause of action against defendants in some manner, and a designation of plaintiff subclasses in conformity with such severance, may and probably ultimately will be necessary, unless this action is dismissed on other grounds.

However, for the purposes of dealing with pretrial matters, it would not be appropriate to make such an order at this time. Therefore, the court reserves any decision on the issues of improper joinder and severance of defendants.

## V. PUNITIVE DAMAGES

Another objection raised by defendants is that plaintiff has failed to set forth a cause of action, or to allege facts supporting a claim for punitive damages. Exemplary damages are awarded only in rare occasions where the acts complained of have been committed "wilfully and maliciously, or, in the absence of actual malice, where it has been committed under circumstances of violence, oppression, outrage, or wanton recklessness": Phila. Traction Co. v. Orbann, 119 Pa.

37, 44 (1888). Such conduct has neither been specifically pleaded, nor can it be inferred from the allegations of the instant complaint. Moreover, Pennsylvania courts have overwhelmingly held that exemplary damages are not permitted in actions in assumpsit. In Hoy v. Gronoble, 34 Pa. 9, 11 (1859), the Supreme Court of Pennsylvania said:

"[A]n allowance of vindictive damages . . . is not permitted in actions for a breach of contract, with very rare exceptions, perhaps in none, except the single case of breach of promise of marriage. The violation of most contracts involves a breach of faith. If a promissor must respond in damages for that as well as for his violation of his promise, he must make duplicate satisfaction."

See also Restatement Contracts, §342; Feist v. Plymouth Mutual Life Insurance Co., 48 Luz. 296 (1958); Krapta v. Yelen, 42 Luz. 194 (1952); Hurtt v. Stirone, 106 Pitts. L.J. 310 (1958).

An exception to the above-stated rule has been made only when the breach of contract amounts to an independent, willful tort and there are proper allegations of malice, wantonness or oppression: Morgan v. Continental Credit Corp., 58 D. & C. 620, 625 (C. P. Phila. Co., 1947). See also Richette v. Pennsylvania Railroad, 410 Pa. 6 (1963); and National Bank of Kennett Square v. Adams, 10 Chester 430 (1962). Clearly, the allegations of the complaint do not set forth an independent cause of action in trespass.

Furthermore, there is precedent for holding that in Pennsylvania exemplary damages are never permitted in equity cases. In People's National Bank v. Kern, 193 Pa. 59, 63 (1889), the Supreme Court of Pennsylvania said:

"Decrees in equity, even when based upon frauds and conspiracies, are given for the amounts out of

which the injured parties have been defrauded, and not for punitive damages, fines or penalties."

See also Power of equity court to award exemplary or punitive damages, 48 A. L. R. 2d 947 (1956).

Because the instant action is one in equity, is based on a breach of contract, and because no allegations of malice, violence, oppression, outrage or wanton recklessness have been pleaded, plaintiff and the members of the class he represents are not entitled to punitive damages, and all prayers for such relief must be stricken from the complaint.

## VI. JURISDICTION OF EQUITY

Defendants complain that plaintiff has an adequate remedy at law and that equity has no jurisdiction.[9] They further assert that claims to injunctive relief are unjustified and ancillary to claims for money damages.

It is well established that the mere existence of a remedy at law will not oust equity from jurisdiction. To preclude equity from taking jurisdiction, the legal remedy must be full, adequate and complete: Johnston v. Price, 172 Pa. 427, 435 (1896). As was set forth in the

---

[9] One of the preliminary objections of defendant Humble is that individual actions belong in the Municipal Court of Philadelphia. However, that objection overlooks section 16 (r)(v) of the Schedule to the Judiciary Article providing, inter alia, that the Municipal Court of Philadelphia shall have jurisdiction in "all civil claims involving less than five hundred dollars," but that "this limited grant of jurisdiction shall be co-extensive with the civil jurisdiction of the trial division of the court of common pleas."

That section is a limitation on the jurisdiction of the Municipal Court but in no way effects the grant to Common Pleas in section 16(o) of "unlimited original jurisdiction in all cases except those cases assigned by this schedule to the municipal court and to the traffic court." (Emphasis supplied.)

The Court of Common Pleas has jurisdiction to hear all civil cases, irrespective of the amount in controversy, except those within the jurisdiction of Commonwealth Court.

Pennsylvania Supreme Court in Pennsylvania Railroad Co. v. Bogert, 209 Pa. 589 (1904):

"The most comprehensive statement of the rule and the one which has been followed by this court ever since its announcement in 1850 by Judge King in Bank of Virginia v. Adams, 1 Parsons, 534, is as follows: 'To induce equity to refuse its aid to a suitor, it is not sufficient that he may have some remedy at law. An existing remedy at law to induce equity to decline the exercise of its jurisdiction in favor of a suitor must be an adequate and complete one. And when from the nature and complications of a given case, its justice can best be reached, by means of the flexible machinery of a court of equity, in short where a full, perfect and complete remedy cannot be afforded at law, equity extends its jurisdiction in furtherance of justice.' . . . Or as this court stated it in Appeal of Brush Electric Co., 114 Pa. 574, 'A bill may be sustained solely on the ground that it is the most convenient remedy.' It has also been held that where the remedy is doubtful equity will entertain a bill": Id. at 601.

See also Schrader v. Heath, 408 Pa. 79, 83-84 (1962).

Equity has jurisdiction of the enforcement of contracts, whether they be express or implied: Strank v. Mercy Hospital of Johnstown 383 Pa. 54, 57 (1955). Just as a court of equity has the power to enjoin a continuing trespass (Gardner v. Allegheny County, 382 Pa. 88, 102 (1955)), it has the power to require specific performance when there is a continuing breach of contract, and this is especially true when the public interest or convenience is at stake: Edison Illuminating Co. v. Eastern Pennsylvania Power Co., 253 Pa. 457, 464 (1916).

In Gray v. Citizens' Gas Co., 206 Pa. 303 (1903),

plaintiff brought a bill in equity to compel specific performance of a contract to supply it with gas. In reversing the lower court's dismissal of plaintiff's bill and remanding the case for further proceedings, the Supreme Court of Pennsylvania said:

"The question raised in this case is not alone whether plaintiff has a remedy at law, for that remedy it clearly has, but whether in view of the facts it is an adequate one. It may be conceded, that the time is not very remote in our judicial history, when a wronged party sought the intervention of equity, and he could be truthfully met by the reply, you have a remedy at law in action for damages, such reply would have been the end of his bill; he would have been turned out of court for want of jurisdiction. But this answer is no longer conclusive as to the jurisdiction; courts now go further and inquire, whether under the facts the remedy at law is not vexatiously inconvenient and whether it is so proximately certain as to be adequate to right the wrong complained of": Id. at 305.

On remand, the lower court, while acknowledging plaintiff's right to equitable relief, refused to decree specific performance because defendant had begun to supply plaintiff with adequate supplies of gas. Once more, the Supreme Court reversed, and granted specific performance because "this was a continuing contract, involving service in the future as well as in the past. Performance had been refused, and might be refused again": Gray v. Citizens' Gas Co., 212 Pa. 473, 476 (1905).

Evaluating the facts of the instant action in terms of the foregoing, it seems apparent that money damages alone would not provide a full, adequate or complete remedy. Without appropriate injunctive relief, plaintiff and other members of the class could

find themselves in the position of expending substantial resources in an effort to gain small recoveries, and yet find continuing the oppressive activities about which they had complained. Considering as well the "nature and complications" of this case and the fact that successive litigation would be "vexatiously inconvenient" for the court as well as the parties, it must be concluded that " 'justice can best be reached, by means of the flexible machinery of a court of equity' ": Pennsylvania Railroad Co. v. Bogert, supra.

## VII. JOINDER OF SUBLESSEES

The final issue for discussion involves Atlantic's assertion that it has sublessees other than Howard Johnson, who are indispensible parties to the suit, and who have not been joined as parties defendant.

Pennsylvania Rule of Civil Procedure 2229(d) provides for compulsory joinder of defendants in actions ex contractu only when an obligation is joint. If the obligation is joint and several, it is at the option of plaintiff whether to join any or all obligors as defendants: 2 Standard Pa. Pract. Parties, §62. In the instant. case, the sublessees were not parties to the principal contract between Atlantic and the Turnpike Commission. Therefore, any obligation of the subleasee would not be joint, but rather would be joint and several. Thus, joinder of any or all sublessees is solely at the option of plaintiff.

If defendant Atlantic desires to bring its sublessees into this action, it need only join them as additional defendants under Pa. R. C. P. 2252.

## CONCLUSION

After careful consideration, the court finds:

(1) Plaintiff and the class which he purports to represent have standing to maintain this action as third-party beneficiaries;

(2) The members of the class are so numerous that joinder of all members of the class in the same action is impracticable;

(3) There are common questions of law and fact;

(4) The claims of plaintiff are typical of the class represented;

(5) Plaintiff is a proper representative of the class and will fairly and adequately represent the class;

(6) With the exception of certain questions concerning manageability, the maintenance of this action as a class action is superior to other methods for the efficient resolution of this controversy;

(7) If this action is otherwise determined to be manageable, the fluid class recovery device may be an acceptable means of determining and distributing damages;

(8) The determination of whether defendants have been properly joined, and whether the cause of action against Howard Johnson should be severed from the cause of action against the other defendants is, at this time, premature;

(9) Plaintiff's prayer for punitive damages is neither supported by the factual allegations of the complaint, nor by the law;

(10) A court of equity has jurisdiction to hear and determine this action;

(11) Joinder of defendants' sublessees is a matter of discretion with plaintiff;

(12) The issue of manageability cannot be determined pending an evidentiary proceeding to establish facts bearing thereon.

The court believes a proper approach to determining the key questions of manageability and notice is that set forth In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions, 333 F. Supp. 278 (S.D.N.Y., 1971) as discussed in Manual for Complex and Multidistrict Litigation, Bulletin No.

26, April 23, 1971. There, the court required plaintiffs to demonstrate that the actions were sufficient and that notice was possible, by requiring them to answer specific questions directed to these issues. Plaintiff should thereafter submit to the court a memorandum. The court, after evaluating this information, would then be in a position to hold further evidentiary hearing for the purpose of determining the manageability of the action.

## ORDER

Accordingly, it is ordered:

(1) That no notice shall be sent to any potential members of the class pending further order of this court.

(2) That plaintiff's prayers for punitive damages are to be stricken from the complaint.

(3) Defendants' preliminary objections relating to failure to state a cause of action; lack of particularity of the complaint; and failure to join necessary parties defendant are hereby dismissed.

(4) That plaintiff file within 45 days a memorandum of fact and law with reference to legal authority and factual documentation concerning:

(a) The approximate size of the class which he seeks to represent and how that size was determined;

(b) How many of these persons can be identified through reasonable efforts;

(c) How identified class members are to be notified at each point in the progress of this litigation;

(d) How members who are not capable of identification are to be notified at each point in the progress of this litigation;

(e) The approximate costs of notice and communications; and who should initially bear the costs of same;

(f) The specific items or products and services involved in the alleged overcharges;

(g) How plaintiff intends to prove the alleged overcharges, and problems in connections therewith;

(h) An approximation of how much in damages might reasonably be expected to be proved in relation to the class as a whole;

(i) An approximation of the number of members of the class who would be expected to file claims;

(j) An approximation of how much in damages would be expected to be proved by the class members who file claims;

(k) If damages are computed on a class level, and if a lesser sum is actually claimed by class members, how the residue is to be dealt with;

(l) An itemization of the costs which the plaintiff can reasonably be expected to incur, including attorney fees and the costs of notice;

(m) How inquiries from, and communications with members of the class would be handled;

(n) Whether subclasses should be established and the potential membership of each recommended subclass;

(o) If there are subclasses established, whether the cause of action against the various defendants should be severed in any way.

(5) Defendants are to file reply memoranda within 45 days from receipt of plaintiff's memorandum.