[No. A084357. First Dist., Div. Four. Oct. 21, 1998.]

NORTH SHUTTLE SERVICE, INC., Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent.

**COUNSEL**

Hanson, Birdgett, Marcus, Vlahos & Rudy and Daniel W. Baker for Petitioner.

Peter Arth, Jr., Mary F. McKenzie and Kimberly Lippi for Respondent.

## OPINION

**HANLON, P. J.**—According to reports from other districts, this is the first petition for writ of review invoking the Court of Appeal's newly established jurisdiction to review decisions of the Public Utilities Commission (Commission or PUC). By amendments effective January 1, 1998 (Stats. 1996, ch. 855, §§ 1-26), litigants are no longer restricted to seeking review in the California Supreme Court. They may petition the Court of Appeal for the district in which they reside or establish their principal place of business (Pub. Util. Code, § 1756, subds. (b) & (e)).[1]

New statutes frequently present new legal issues for the courts; this one is no exception. We consider in this opinion only a request by petitioner, North Shuttle Service, Inc. (North), to stay the effect of a Commission ruling revoking North's "certificate of public convenience and necessity" and its "charter-party" certificate. Several Public Utilities Code sections prescribe conditions for stays by appellate courts (§ 1761 et seq.). The stay provisions were adopted in 1911 (Stats. 1911, Ex. Sess., ch. 14, § 68, pp. 56-57) and then augmented in 1933 (Stats. 1933, ch. 442, § 68, pp. 1158-1160). Although reworded slightly in 1951 (Stats. 1951, ch. 764, §§ 1761-1764, pp. 2091-2092), they have remained much the same since 1933. However, the Supreme Court has provided very little guidance for their application.[2] Thus, the questions they raise are issues of first impression for the Court of Appeal. We will consider these statutes after explaining the procedural history of this case.

### Procedural History

On November 21, 1995, the Commission authorized North to operate an airport shuttle service serving three San Francisco Bay Area airports. Fourteen months later, the Commission issued an order instituting investigation (OII) to inquire into allegations that North had violated various PUC statutes and general orders and certain airport rules. Shortly afterwards, North asked the Commission to approve its transfer of majority stock ownership from

---

[1] All further statutory references are to the Public Utilities Code.

[2] The Supreme Court mentioned but did not discuss sections 1762-1764 in *City of Los Angeles* v. *Public Utilities Commission* (1972) 7 Cal.3d 331, 355 [102 Cal.Rptr. 313, 497 P.2d 785], and referred there to its decision in *Market St. Ry. Co.* v. *Railroad Commission* (1946) 28 Cal.2d 363, 368 [171 P.2d 875] (*Market St. Ry. Co.*), which addressed an earlier version of the statute (Stats. 1933, ch. 442, § 68, pp. 1158-1160). Each of those cases involved a commission's decision to increase or decrease rates, a decision which the courts can no longer stay (§ 1761, subd. (b)), and neither analyzed the statutes in any detail.

Martin B. Smith to Eugene Yen. The parties agreed to consolidate the OII and ownership transfer request into a single proceeding.

After nine days of hearings before an administrative law judge, the Commission issued its decision on May 7, 1998, finding that North had violated various statutes, general orders and airport rules and regulations. The Commission ordered North's "operating authorities . . . revoked" and suspended Smith's right to participate in regulated transportation for a period of one year. It denied the request to transfer control of North to Yen and dismissed the transfer application as moot. The Commission made its decision effective in 30 days in order to furnish North an opportunity to request rehearing, a prerequisite to seeking appellate review (§ 1731).

North petitioned for rehearing, triggering a 60-day statutory stay of the decision (§ 1733), which the Commission then extended "until October 24, 1998, or until the date upon which we render our decision on rehearing, whichever occurs first." On September 17, 1998, the Commission denied rehearing.

On October 5, 1998, North filed in this court a timely petition for writ of review (§ 1756), incorporating a motion for a temporary stay of the Commission's decision. We consider now North's motion. Although we will deny the stay request, we take the unusual step of resolving the motion by written opinion because the statutes warrant appellate court emphasis and interpretation.

### Statutes Governing Stays

Section 1761 provides: "(a) Any stay or suspension of an order or decision of the commission shall be granted only in accordance with this article and the rules of court. [¶] (b) A stay may be issued against any order or decision of the commission, other than an order or decision increasing or decreasing rates or changing a rate classification."

Section 1762 requires five days' notice and a hearing before a stay is issued and requires that the appellate court stay order "(a) . . . contain a finding, based upon evidence submitted to the court and identified by reference thereto [¶] (b) . . . that great or irreparable damage would otherwise result to the petitioner" and requires that the order "specify the nature of the damage." Section 1762 further provides that the appellate court may grant a temporary stay before the hearing "when, in the opinion of the court, irreparable loss or damage would result to petitioner unless the temporary stay is granted." Such temporary stay will remain in force only until the

hearing, which shall be given precedence and be held at the "earliest practicable day" after expiration of the five-day notice period. (§ 1762, subd. (c).)

Section 1763 elaborates on the temporary stay provision: "(a) No temporary stay shall be granted by the Supreme Court or court of appeal unless it clearly appears from specific facts shown by the verified petition that immediate and irreparable injury, loss, or damage will result to the applicant before notice can be served and hearing had on a motion for a stay as provided in this article [¶] (b) Every temporary stay shall be endorsed with the date and hour of issuance, shall be forthwith filed in the clerk's office and entered of record, shall define the injury and state why it appears to be irreparable and why the order was granted without notice, and shall by its terms expire within a time after entry not to exceed 10 days as the court may fix, unless within the time so fixed the order is extended for a like period for good cause shown and the reasons for the extension entered of record. [¶] (c) In case a temporary stay is granted without notice, the matter of the issuance of a stay shall be set down for hearing at the earliest possible time, and when it comes up for hearing the party obtaining the temporary stay shall proceed with the application for a stay. If the party does not so proceed, the court shall dissolve the temporary stay."

Finally, section 1764 imposes a requirement that the party seeking a stay post a suspending bond: "In case the order or decision of the commission is stayed or a temporary stay granted, the order of the Supreme Court or court of appeal shall not become effective until a suspending bond is executed and filed with and approved by the court, payable to the people of the State of California and sufficient in amount and security to insure the prompt payment by the party petitioning for the review, of all damages caused by the delay in the enforcement of the order or decision of the commission and of all money which any person or corporation may be compelled to pay pending the review of the proceedings for transportation, transmission, product, commodity, or service in excess of the charges fixed by the order or decision of the commission, in case the order or decision is sustained."[3]

### A Temporary Stay

■ North cites section 1763 and asks for a "temporary stay," asserting that "immediate and irreparable injury, loss or damage will result to North

---

[3]Section 1765 also involves stays. It authorizes the appellate court to attach reasonable conditions to a stay and to permit a public utility to charge a higher rate pending decision on a challenge to the commission's denial of a rate increase. However, the Governor recently approved legislation, effective January 1, 1999, repealing section 1765. (Stats. 1998, ch. 886, § 18, Sen. Bill No. 779, filed with the Secretary of State Sept. 28, 1998.)

before notice can be served and hearing be held on motion to stay." North has presented declarations from Smith and others valuing each of North's 13 San Francisco Airport permits at $15,000-25,000 or more and suggesting that the entire value of each permit will be lost if the revocation takes effect. North's declarations state that the company will lose from $2,500 to $4,000 in revenues each day or between $75,000 and $120,000 per month because of the revocation. North predicts worse service for the traveling public and loss of employment by its drivers and others. Without revealing financial details, North asserts that, without any income, it will be unable to continue to maintain its office and services or to pay its suppliers.

We are by no means unsympathetic to the plight of North or its employees and customers. However, the Legislature has erected substantial barriers to granting temporary stays. It must "clearly appear[] from specific facts shown by the verified petition" that irreparable injury will result "before notice can be served and hearing had on a motion for a stay." (§ 1763, subd. (a).) Our order granting a temporary stay must "define the injury and state why it appears to be irreparable and why the order was granted without notice." (§ 1763, subd. (b).)

Although North has presented *some* evidence of the long-term adverse effects of the revocation, it has provided no specific facts justifying a temporary stay. It has failed to show that irreparable injury would result during the first five to ten days after filing the motion for a stay, as section 1763 requires. ██ ██ ██ Although, by North's figures, lost revenue during that period could reach $40,000, North has not shown that such financial loss would cause irreparable injury.[4]

Neither has North shown that the airport permits would become worthless before it could reasonably expect this court to hold a hearing on its motion for a stay. Indeed, North admits that the airport ordered North's service terminated on September 18, 1998, more than two weeks before North filed the petition, and North admits that it complied with the airport's order. North having failed to show us the contrary, we must assume either (1) that the

---

[4]We note also that Martin Smith's purported verification of the petition declares under penalty of perjury that "the foregoing is true and correct." However, "the foregoing" is only Smith's statement that he is president of North and authorized to act on its behalf and that he had "read the foregoing document, and [was] informed and believe[d] that the matters therein are true."

In writ proceedings, a verification upon information and belief is insufficient proof of facts asserted in the petition. (See *Star Motor Imports, Inc.* v. *Superior Court* (1979) 88 Cal.App.3d 201, 204-205 [151 Cal.Rptr. 721].) Thus, factual assertions in the writ petition add no weight to North's sworn declarations.

permits already became worthless on September 18, 1998, and that a stay would not remedy that situation, or (2) that the permits would not become irredeemably worthless during the short period between North's filing the motion and any hearing this court might have held on the stay request.

Even with a better showing, North would have encountered another substantial hurdle to obtaining an effective temporary stay. Under section 1764, any stay granted would not take effect "until a suspending bond" was executed, filed here, and approved by this court.

### A Suspending Bond

■ The Legislature has imposed the bond requirement on both temporary and long-term stays—those which would last throughout the appellate court proceedings. In the case of the temporary stay, the bond requirement will often virtually nullify the court's temporary stay, making it difficult for the petitioner to obtain an effective stay before the hearing on a long-term stay could take place. For the stay to take effect, not only must the appellate court set an amount for the bond, but the petitioner must obtain a bond and file it in the appellate court, which must examine and approve the bond and any security. These proceedings would often consume the entire five to ten days before the hearing on the long-term stay.

For a temporary stay, the statute seems to contemplate that simultaneously with granting an ex parte stay request by the petitioner, the appellate court would either establish an undertaking amount or approve an amount proposed by the petitioner. In selecting an amount for the bond, the court would be guided only by the statutory requirement that it be "sufficient in amount and security to insure the prompt payment by the party petitioning for the review, of all damages caused by the delay in the enforcement of the order or decision of the commission and of all money which any person or corporation may be compelled to pay pending the review of the proceedings for transportation, transmission, product, commodity, or service in excess of the charges fixed by the order or decision of the commission, in case the order or decision is sustained." (§ 1764.)

Because we deny the stay request, we need not determine the bond amount.[5]

---

[5]The statute does not explain how the appellate court would determine the bond amount. Neither of the two apparent sources for the amount of the undertaking accompanying a temporary stay would very reliably provide the appropriate amount: (1) petitioner (who may

*A Long-term Stay*

 An appellate court cannot order a long-term stay of a Commission decision without petitioner or the court providing five days' notice, the court holding a hearing on the stay request, and the court stating findings in its order and referring to evidence supporting the findings. (§ 1762, subd. (a).) It does not follow, however, that the appellate court must hold a hearing on every application for a stay. If, as we find in this case, the petitioner has not demonstrated the conditions for a stay, the appellate court may summarily deny the request. Unlike the situation when the appellate court grants a stay, it may at any time deny a stay request by order without any further proceedings and without explaining its reasons. For the benefit of other litigants, however, we explain our reasons for denying North's stay request.

North merges an express request for a temporary stay (§ 1763) with an implied request for a stay pending determination of its petition by this court (§ 1762), failing to acknowledge in its arguments statutory differences between the two.[6] In the process, North neglects to provide specific information about when its airport permits would become worthless and its financial reserves, if any, exhausted without a stay. Neglecting also to predict how

know something about the potential damage but would be required to post the bond and would be tempted to understate its amount) could supply a suggested bond amount or (2) the appellate court (which would know little more about the case or potential damage than petitioner conveys) could guess who would be damaged and by what amount if a stay is issued. A temporary stay would be short, would be granted ex parte, and would terminate with the hearing on the long-term stay. It seems unlikely, therefore, that the Legislature contemplated a separate hearing on the amount of the suspension bond supporting the temporary stay. Setting the undertaking amount for a temporary stay would be a "shot in the dark," at best.

The Commission could make the appellate court's task much easier by, for example, establishing some model figures for daily losses when stays are imposed in various kinds of cases (e.g., based upon industry, size of operation, or other factors more within their expertise than ours) or by including in its decisions its best estimates of the daily damage caused by a stay of its decision. A figure proposed by the Commission would form at least a starting point for the appellate court setting of a bond amount and a target for the petitioner seeking to convince the court of a different amount.

Alternatively, the appellate court might be forced to remand the question of the bond amount to the Commission or to set only a nominal bond and invest the Commission with the authority to increase the amount upon a proper showing by those who would be harmed by the stay.

[6]A declaration by North's attorney does state that the stay is being sought under section 1763 "rather than" section 1762 because of the five-day notice period for section 1762. Counsel fails to understand, however, that section 1763 is supplementary to section 1762 and that a temporary stay without a request for a long-term stay has little value. A section 1763 stay expires by its own terms in 10 days unless the court extends the period for good cause (§ 1763, subd. (b)). If such a stay is granted, a hearing must be held on the application for a

long this court will take to resolve its petition, North asserts that the issues will become moot because North's business will be destroyed if we do not stay the Commission's decision.

A party seeking from this court a stay of the Commission's decision must present, by verified petition or sworn declaration, specific evidence showing that "immediate and irreparable injury, loss, or damage will result" if the decision is not stayed. (§ 1763, subd. (a).) Some injury, loss, or damage is inherent in any adverse decision by the Commission; a certificate revocation decision is almost certain to cause some measure of financial loss. Under one reading of the statute, this typical loss of revenues and diminishment or destruction of permit values in a revocation case would constitute "injury, loss, or damage," and the revenue forfeited on any particular day because of a revocation would be considered an "irreparable" loss because the lost day could never be recovered.

We do not read the statute this way. As in other appellate court proceedings, we start with the presumption that the Commission's decision is correct and will probably be implemented. The Legislature appears also to have started with this presumption. By its detailed statutory scheme for stays and its requirement of express findings based upon specific facts for both temporary and long-term stays, the Legislature demonstrated an intent that granting a stay would be an atypical event, not a routine activity. Implicitly, the Legislature did not expect that its requirement of "immediate and irreparable injury, loss, or damage" would be satisfied by the petitioner's demonstrating only how much potential revenue the company would lose each day and estimating the asset value it would lose if its permits became worthless.

We conclude that it is not enough merely to present evidence of the asset value of its permits and the revenue a petitioner might lose each day, as North has done. A petitioner seeking to show irreparable damage from loss of operating permission must help us to understand the details of its financial situation. In a typical revocation case, this showing would mean advising us of its income from all sources and expenses and reserves, how long they will last, and any measures available to cut costs or to increase income, such as by a temporary diversion of resources to unregulated activities. It would also mean telling us its prospects for borrowing enough to keep the business afloat during the review period. Only after we correlate our understanding of when appellate review will probably be completed with the petitioner's

long-term stay, and if the petitioner does not proceed at the hearing, the court shall dissolve the temporary stay. (§ 1763, subd. (c).)

showing of how seriously it is hurt and how long the business can survive without revenue from its permits will we properly be able to determine whether the damage is irreparable.

North having failed to make an adequate showing of irreparable harm, the request for a stay is denied.

Poché, J., and McGuiness, J., concurred.